1 A.3d 528

**Mark E. FURDA**

v.

**STATE of Maryland.**

**No. 2240, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

July 6, 2010.

Reconsideration Denied Sept. 14, 2010.

2 

**4**

Walter Booth of Bethesda, MD, for appellant.

Brenda Gruss (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: DAVIS, HOLLANDER and MEREDITH, JJ.

HOLLANDER, J.

Following a bench trial in the Circuit Court for Montgomery County (Rubin, J.), Mark Edward Furda, appellant, was convicted of perjury, in violation of Md.Code (2002, 2007 Supp.), § 9–101(a)(2) of the Criminal Law Article ("C.L."), and giving false information or making a material misstatement in a firearm application (the "false statement" charge), in violation of Md.Code (2003, 2007 Supp.), § 5–139(a) of the Public Safety Article ("P.S."). After merging the false statement conviction, the court sentenced appellant to ten years' incarceration for the perjury offense, with all but five years suspended.

The underlying convictions arose from appellant's submission on January 24, 2008, of a Maryland State Police Application and Affidavit to Purchase a Regulated Firearm (the "Application"), in which Furda represented, under oath, that he had never been "committed to a mental institution." At that time, Furda knew that, in connection with a case in which he had pleaded guilty to violation of a Final Protective Order, under §§ 4–506 and 4–509 of the Family Law Article, the circuit court had recently issued an Order denying his request for the return of his firearms. In the Order, the court found that Furda was barred, under federal law, from possessing a firearm, because his emergency mental health evaluation in 2003 constituted an involuntarily commitment to a mental institution.

From Furda's arguments in his brief, we distill the following questions:[1]

---

[1] In his brief, Furda failed to present questions for review. Instead, the brief contains five arguments and several subcontentions. Maryland Rule 8–504(a)(3) requires a brief to include "[a] statement of the questions presented, separately numbered, indicating the legal propositions involved and the questions of fact at issue expressed in the terms and circumstances of the case without unnecessary detail." However,

**6**

1. Was the evidence sufficient to convict appellant of perjury and false statement, when the State's only evidence that appellant had previously been committed to a mental institution was a circuit court order that was "clearly in error" and when appellant was never found to be committed under Maryland law and he therefore truthfully responded to the Application?

2. Did the court err by improperly shifting the burden of proof to appellant and by usurping the prosecutorial function?

3. Did the court err in denying appellant's request to take judicial notice of medical records in the file?

4. Did the court err or abuse its discretion in denying appellant's Motion for New Trial?

For clarity, we shall refer to this matter as the "Perjury Case," and we shall refer to the domestic violence proceedings as the "Protective Order Case." The Protective Order Case is the subject of a companion appeal, in which Furda challenged the circuit court's Order that his emergency mental evaluation in 2003 constituted a commitment, so as to bar his possession of any regulated firearms. *See Furda v. State,* 193 Md.App. 371, 997 A.2d 856 (2010).[2] We agree with Furda in the companion appeal; we have concluded that the court erroneously determined that Furda's admission amounted to a commitment under federal law. Nevertheless, we conclude that the court's error in the Protective Order Case does not exonerate appellant in the Perjury Case. Therefore, for the reasons explicated below, we shall affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The story of this case begins with domestic problems between appellant and his former wife, Karen Furda. According

---

the State does not complain about appellant's omission. In the exercise of our discretion, we decline to dismiss the appeal on this basis. *See Simmons v. State,* 392 Md. 279, 292 n. 1, 896 A.2d 1023 (2006).

**2.** Although the cases and appeals are separate, they are integrally related.

to an "Incident Report" submitted on February 28, 2003, by a Deputy Sheriff for Montgomery County,[3] the Sheriff's Office served Mr. Furda on February 27, 2003, with a petition for an emergency mental evaluation, initiated by Ms. Furda, and with "a temporary protection order" (Case No. 0601 SP006212003), issued by the District Court for Montgomery County, also in response to a petition filed by Ms. Furda. Ms. Furda claimed, *inter alia*, that appellant had several guns in the house, and she consented to a search of the home. During the search, the Sheriffs seized many weapons, including fifteen rifles, one handgun, and a large quantity of ammunition. The items are detailed on a "Seized Property/Evidence Log" prepared by the Sheriff's Department.

On February 27, 2003, Furda was transported to Montgomery General Hospital (the "Hospital") for an emergency mental health evaluation. From there, he was transferred to Potomac Ridge Behavioral Health ("Potomac Ridge"). He was discharged on or about March 4, 2003.

According to the record, Ms. Furda obtained a Final Protective Order against Mr. Furda on March 6, 2003. It stated, in part: "While this Protective Order is in effect you may be subject to a federal penalty under the 1994 amendment to the Gun Control Act, 18 U.S.C. Section 922(g)(8), for possessing, transporting, or accepting a firearm."

On January 31, 2005, Ms. Furda applied for a Statement of Charges, accusing appellant of violating another Final Protective Order, dated September 21, 2004, by contacting her and threatening her.[4] As a result, on March 3, 2005, Furda was charged in a one-count Information with

---

3. The Incident Report was attached to the "State's Response to Defendant's Motion for Returning Property (Firearms)," filed in the Protective Order Case. Although it did not come into evidence at the trial of the Perjury Case, it is part of the record. Neither side disputes its content.

4. We do not have the records from the District Court pertaining to the issuance of the two protective orders. However, the parties do not dispute their issuance.

fail[ing] to comply with [the Protective Order] ... dated September 21, 2004, issued under Section *4–506* of the Family Law Article, that ordered the respondent to refrain from contacting and attempting to contact Karen Furda, by contacting her in writing, and is a **subsequent offender,** in violation of Section 4–509 of the Family Law Article against the peace, government, and dignity of the State.

*See State v. Furda,* Case No. 101933, Circuit Court for Montgomery County. As we indicated, at a hearing on July 26, 2005, appellant pleaded guilty to one count of "Protective Order—Fail to Comply/Subsequent Offender." The court sentenced him to a suspended, one-year term of incarceration and two years of probation.

On September 13, 2006, while Furda was still on probation in the Protective Order Case, he filed a "Motion" in that case, pro se, seeking the return of his archery equipment and "other related items. Buck skinning knives, Bows, Arrows, Arrow Release [and] fanny packs," which had been seized during the search of his home in February 2003. According to the docket entries, the court denied the Motion, without prejudice, on November 1, 2006.

On July 30, 2007, a few days after appellant completed his two-year probation in the Protective Order Case, he filed another "Motion," also pro se, asking for the "release of all [his] property held for safe keeping by the Montgomery County Sheriff's Department." The State opposed the Motion. On October 31, 2007, before the court ruled on the second Motion, appellant, through counsel, filed a "Motion To Return Property," in which he sought the return of all the property seized by the Sheriffs in 2003, including his firearms.

The court (Harrington, J.) held a motion hearing on November 7, 2007, at which appellant was present. In open court, the court agreed to the release of various items, but otherwise took the matter under advisement. On the same date, the circuit court issued an "Order" (docketed November 9, 2007), denying appellant's motion for the return of his firearms. The Order noted that appellant sought the return of "firearms and

ammunition seized by the Office of the Sheriff for Montgomery County ... at the time a Domestic Violence Protective Order was served" on appellant. Moreover, the court noted that the Protective Order had "expired and probation arising from a related criminal case is now closed." The Order also said: "All items appearing on the inventory that are not firearms or ammunition have already been or will be returned to the Defendant by agreement of the State and pursuant to Court order...."

Of import here, the court determined:

Upon the evidence presented, the Court finds that Defendant Mark Furda is considered a prohibited person under 18 U.S.C. Section 922(g)(4) as a result of having been involuntarily committed to a mental institution and is thereby prohibited from possessing firearms.

The court also concluded that appellant was prohibited from possessing firearms under Montgomery County Code § 57–9(d) (2004). However, the court did not address whether appellant was barred from possessing firearms under State law. The Order concluded: "**ORDERED,** that [Furda's] Motion to Release Personal Property be and the same hereby is **DENIED.**"

We pause to review 18 U.S.C. § 922 (2005), which provided, in part (emphasis added):

### § 922. Unlawful acts.

(a) It shall be unlawful—

\* \* \*

(6) for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or other disposition of such

firearm or ammunition under the provisions of this chapter[.]

\* \* \*

(g) It shall be unlawful for any person—

\* \* \*

(4) *who has been adjudicated as a mental defective or who has been committed to a mental institution*

\* \* \*

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.[5]

On December 3, 2007, appellant moved for reconsideration of the Order of November 7, 2007. Judge Harrington denied his motion by "Order Of Court" dated January 15, 2008 (docketed January 16, 2008). On February 13, 2008, appellant noted an appeal to the Court of Special Appeals with respect to the Protective Order Case.[6]

In the interim, on January 24, 2008, appellant went to Gilbert's Guns and applied for the purchase of a Ruger Mark III, "a .22 pistol handgun, semiautomatic." Based on the

---

**5.** It is also noteworthy that 18 U.S.C. § 925 provides an avenue of relief to disqualified persons. Section 925(c) permits a prohibited person to

make application to the Attorney General for relief from the disabilities imposed by Federal laws with respect to the acquisition ... or possession of firearms, and the Attorney General may grant such relief if it is established to his satisfaction that the circumstances regarding the disability, and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest....

If the Attorney General denies the requested relief, the person may seek judicial review in the United States District Court. *Id.*

**6.** As we have indicated, in that appeal appellant asked the Court to determine whether the circuit court erred in concluding that he was involuntarily committed to a mental institution within the meaning of federal law.

information he provided in the Application, Furda was charged on March 26, 2008, with perjury and false statement. In particular, Count One alleged that Furda "willfully and falsely [made] an affirmation that he had never been committed to a mental institution . . . .," while Count Two alleged that Furda "knowingly [gave] false information, and [made] a material misstatement on [the firearm] application. . . ."

During discovery in the Perjury Case, and pursuant to the State's request, a subpoena was issued on May 13, 2008, to Potomac Ridge, commanding the production of "certified medical records for patient Mark Furda . . . treatment dates: 2/28/03 thru 3/5/03." [7] On June 23, 2008, the State moved to compel production of the records. In its response, Potomac Ridge claimed that it could not produce the medical records, except " 'in accordance with a Court Order,' or 'as otherwise provided by law'. . . ." On August 8, 2008, the court (Mason, J.) ordered Potomac Ridge to submit the records to the court, under seal. [8]

At the trial on August 20, 2008, the State offered several exhibits, without objection. [9] They included a copy of the docket entries from the Protective Order Case; the Order in the Protective Order Case dated November 7, 2007; the Order Of Court dated January 15, 2008, denying appellant's motion for reconsideration; the Application that appellant signed on

---

7. For the most part, the records indicate that Furda was discharged on March 4, 2003, not March 5, 2003.

8. The docket entries in the Perjury Case do not reflect receipt of the records.

9. Before the trial began, Walter S. Booth, appellant's attorney, told the court that, because he "might end up being a witness" on a "material matter," he had recommended to appellant that he "seek other counsel." Booth explained that his testimony "would actually just be corroborating other testimony." He added: "[E]verything that I would say is going to come out in some other way." Further, he agreed with the court that his "testimony would not be harmful to [his] client[.]" Appellant wanted Booth to represent him. After the court asked Furda a series of questions, it found that appellant's decision to proceed with Booth as his counsel was "made freely, knowingly, voluntarily, and intelligently." Booth ultimately testified during the trial.

January 24, 2008; an Affidavit from the Custodian of Records for the Maryland State Police Firearms Registration Section; and appellant's driver's license.[10]

The Affidavit that appellant signed on January 24, 2008, was central to the Perjury Case. The Application cautioned: "Contact an attorney prior to completing this form if you have any questions." Three of the sixteen questions on the Application are of particular significance:

7. Have you ever spent more than 30 consecutive days in any medical institution for treatment of a mental disorder or disorders? (If a physician's certificate, issued within 30 days prior to the date of this application, certifying that you are capable of possessing a regulated firearm without undue danger to yourself, or to others, is attached to this application, then answer "N/A" for Not Applicable.)

8. *Have you ever been adjudicated mentally defective or have you been committed to a mental institution?* (Emphasis added.)

\* \* \*

12. Did you answer 'YES' to any of the above questions? (If you answered "YES" to any of the above questions, you are prohibited by law from purchasing and/or possessing a regulated firearm.... If you answered 'YES', DO NOT proceed any further with this application).

Question 12 made clear that, if appellant answered "Yes" to Questions 7 or 8, he would not have been permitted to buy the gun. Appellant answered "No" to questions 7 and 8, despite his knowledge that, in the Protective Order Case, Judge Harrington had found that, under federal law, he was ineligible to possess firearms because he had been "involuntarily committed to a mental institution." Furda signed the Application on the line for "Signature of Transferee/Voluntary Registrant and Transferor." Directly above the signature line, the text of the form provided: "I, the below signed Transfer-

---

10. Although the State never offered the Potomac Ridge medical records into evidence, appellant subsequently appended them to his Motion for New Trial.

ee/Voluntary Registrant, certify under penalty of perjury that the above answers are true and correct and that *I am not prohibited by law from purchasing or possessing a regulated firearm.*" (Emphasis added.)

The State called one witness, Brian David Penko. He stated that on January 24, 2008, he worked at "a firearms range" and as general manager of Gilbert's Guns, "a retail store" that sold "[f]irearms, holsters, accessories." Penko recalled that appellant went to Gilbert's Guns on that date to purchase a Ruger Mark III, "a .22 pistol handgun, semiautomatic." Appellant spent "maybe 45 minutes to an hour" talking with Penko's "boss," store owner Charles Richard Gilbert, Jr. When asked if Furda had shown him "any documents relating to anything other than the purchase," Penko replied: "No."

According to Penko, appellant was provided with "Maryland State 77R, parts 1, 2, and 3," i.e., the Application, which included sixteen questions. Penko indicated that he had "filled out" or helped "handgun purchasers" complete an application a "[c]ouple hundred" times. Penko stated that he told appellant "to read each question carefully, answer each question correctly, and initial on each line, on each question. And then sign and date down at the bottom." Appellant initialed next to each question and signed the Application in Penko's presence. Penko also signed the Application, in appellant's presence.

The prosecutor asked whether appellant "appear[ed] to understand what he was doing," and Penko answered: "Yes." When asked whether appellant "appear[ed] to be under the influence of alcohol or drugs or anything" or made "any comments about the application," Penko said: "No." After appellant completed the Application, Penko "forwarded it to the State Police," via facsimile. According to Penko, on February 5, 2008, the State Police "disapproved" the Application. As a result, appellant never obtained the firearm that he sought to purchase on that date.

The State rested, and appellant moved for a judgment of acquittal. He argued: "On the perjury charge specifically, it's

very clear that it has to show that the writing contained a false statement. And that the statement was given willfully—." Defense counsel conceded that, in the Order of November 7, 2007, the court "found that [appellant] was committed under 18 U.S.C. § 922...." But, he argued that the Order was issued in "a civil matter" with a "different standard of proof." Moreover, defense counsel maintained that there was no evidence that appellant "knew the statement was false," and insisted that "there still has to be some evidence that the statements were false." The court denied the motion.

Appellant testified in his own defense. In his view, he "was in no way, shape, or form prohibited from purchasing, owning, or firing a firearm." He recalled that on January 24, 2008, he went to Booth's office before he went to Gilbert's Guns, and "by everything [appellant and his counsel] had read and seen [appellant] was in fact not a prohibit[ed] person."

Furda explained that he sought "to purchase a Mark III Ruger pistol, .22 caliber," and brought his "reconsideration motion" with him to the store to show "that [he] had not been committed nor was [he] a mental defective." He testified that he "showed [the motion for reconsideration] to the owner, Dick Gilbert" and "had it sitting on the counter" when he spoke with Penko. At that time, appellant was unaware that the motion had been denied.

Insisting that he was "[a]bsolutely in the right" with regard to whether he could purchase a firearm, Furda explained: "I am not a felon. And I have never been mentally adjudicated nor have I ever been committed." He concluded: "So thereby and all the law, I should be in fact a person that should be allowed to purchase a regulated firearm." Appellant also stated that, after his Application was denied, he appealed the denial and appeared before an administrative law judge in that matter.[11] No administrative ruling had been issued as of the time of the trial in the Perjury Case.

---

11. Once an application has been completed, the dealer submits it to the Secretary of Public Safety. Under P.S. § 5–122(a), an application may

Claiming that he had never been committed to a mental institution, Furda said:

> I was submitted to an emergency evaluation petition through the courts by my now ex-wife. . . . [She] filed a motion or [sic] false statements . . . saying that I had threatened her and the children, which I had never done.
>
> . . . [T]he Montgomery County Sheriff's Department was sent to my house, and did take me to Montgomery General. . . . I was then transferred to Potomac Ridge for the I guess 72–hour evaluation that is allowable by the courts . . . I had . . . read the discharge [which] stated that the doctor had a dilemma as to whether or not to commit me. However, there was no psychosis, no withdrawals, or bad presence, or anything like that. And that without any type of hearing or any adjudication I was released.

On cross-examination, appellant agreed that he "read each and every question" on the Application, understood the Application, and understood that he was filling it out "under penalty of perjury." Furda conceded that he attended the motion hearing in the Protective Order Case on November 7, 2007. However, he claimed that, prior to his "application to purchase the firearm," he "had not seen" the Order issued on November 7, 2007. The following ensued:

> [PROSECUTOR]: [Y]ou're saying that your lawyer never showed it to you? . . . And your lawyer never told you about it?
>
> [APPELLANT]: Correct. He, what was mentioned to me was that in fact I am not [a prohibited person] and that the

---

be disapproved if: "(1) the Secretary determines that the firearm applicant supplied false information or made a false statement; (2) the Secretary determines that the firearm application is not properly completed; or (3) the Secretary receives written notification from the firearm applicant's licensed attending physician" that the applicant has a mental disorder and presents a danger to the applicant or to others. P.S. § 5–126(a) provides aggrieved applicants with an opportunity for a hearing. Under P.S. § 5–127, "[a]ny subsequent judicial review shall be held in accordance with Title 10, Subtitle 2 of the State Government Article."

guns are not being returned was political not by, by meaning of the law correct.

\* \* \*

[PROSECUTOR]: He never told you about Judge Harrington's order? That's your testimony?

[APPELLANT]: Yes, sir.

[PROSECUTOR]: And you've never seen it, that's your testimony?

[APPELLANT]: I've seen it since. I had not seen it prior to going in and filling out the application to purchase the weapon.

The following colloquy is also noteworthy:

[PROSECUTOR]: Isn't it true, Mr. Furda, that you had the reconsideration in your hand?

[APPELLANT]: No, sir.

[PROSECUTOR]: You just testified under oath that you went in there with a motion for the reconsideration of Judge Harrington's order. You said you had that in your hand.

[APPELLANT]: I had the reconsideration which stated that in fact I had not committed, been committed and was released.

[PROSECUTOR]: So you knew when you went in there that Judge Harrington had denied your request for the return of firearms, because you had the reconsideration that your lawyer filed?

[APPELLANT]: That I hadn't been committed, yes.

[PROSECUTOR]: So ... you had this?

[APPELLANT]: That I had not been ever committed and I have not, yes.

[PROSECUTOR]: And you understood that reconsideration means that you're asking Judge Harrington to reconsider her denial of your request, correct?

[APPELLANT]: Yes, sir.

[PROSECUTOR]: So you kn[e]w, then, because you had the reconsideration that you were a prohibit[ed] person, correct?

[APPELLANT]: No, sir.

[PROSECUTOR]: You're also aware that Judge Harrington did find that you were committed?

[APPELLANT]: At this point, she, I, I don't know how she read it, but I wasn't, so.

Further, the prosecutor asked appellant if he "knew that Judge Harrington had denied [his] request to return [his] firearms because [he was] a prohibit[ed] person from possession." Appellant responded: "No, legally I'm not prohibited. If I've never been committed, I am not a prohibit[ed] person." Appellant did not agree with the prosecutor that, "since [he] knew that Judge Harrington had denied [his] request to return [his] firearms that Judge Harrington had found that [he] had been involuntarily committed to Potomac Ridge and that [he was] prohibited from possessing firearms . . .[.]" But, appellant conceded that he "talked" to his attorney about moving to reconsider the Order of November 7, 2007, and "agreed to enter for a reconsideration."

On redirect, appellant testified that he had not seen the Order of January 15, 2008, denying the motion for reconsideration, when he completed the Application. Appellant indicated he was brought from the Hospital to Potomac Ridge in "an ambulance, no[t] [by] law enforcement."

Michael Patrick Flynn, who identified himself as appellant's brother, testified that he went to Gilbert's Guns with appellant on January 24, 2008. He recalled that appellant spoke with Mr. Gilbert for "[a]pproximately a half hour, 45 minutes" and "showed him . . . the reconsideration papers for the release of his firearms." Flynn said that, when he went with appellant to Gilbert's Guns, he and appellant both "thought that [the circuit court's ruling] was political. . . ."

Booth also testified. He stated: "[A]t some point we have [sic] received the order denying the motion for return of property. . . . Judge Harrington's order." Contrary to appel-

lant's testimony, Booth claimed that he informed appellant of the Order of November 7, 2007. But, he also claimed that he told appellant that he did not believe he was "ineligible" to purchase a firearm. The following exchange is relevant:

[THE COURT]: *Did you share the contents of Judge Harrington's ruling with your client?*

[BOOTH]: *Yes, I did, Your Honor.... And then we filed a motion for reconsideration .... on December 3rd, 2007* .... And we did not receive a denial of that and at some point over several conversations with Mr. Furda, he had asked me if he could go out and purchase or possess a firearm.... *And I told him, based upon my research, I didn't see any reason that he was ineligible.... And I may have also cautioned that, you know, that was my opinion, but that I saw nothing.* He asked for a copy of the motion and I gave Mr. Furda a copy of the motion....

*I did not receive a copy of the denial of the motion for reconsideration until after Mr. Furda had called me and told me he had been arrested ....* That was the first time that I'd seen that the motion for recon [sic] had actually been denied. I know that the, I guess it's dated like January 16th, and he apparently went down to the gun shop on January 24th.... It would have been my belief that the motion was still pending at that time. And I, you know, if he had asked me "Did we receive an opinion yet?" that would have been my answer is that we have not received an opinion at this time.

The following colloquy is also noteworthy:

[PROSECUTOR]: ... [D]on't you think that you had an obligation, regardless if the Court didn't send it, to just kind of keep your finger on the pulse of your motion? ... Isn't that like a lawyer's duty of diligence?

[BOOTH]: At some point, well, we had filed it back on December 3rd. And I know at some point I did call and asked what's happening with it and was told that it was still

pending. Now that probably would have been, you know, maybe before Christmas.

* * *

[PROSECUTOR]: *Now, you had like you said (unintelligible) you discussed Judge Harrington's order with your client?*

[BOOTH]: *Yes, the first order.*

[PROSECUTOR]: *Right. Unquestionably then Mr. Furda understood that Judge Harrington ruled that he was a prohibit[ed] person because he was involuntarily committed, correct?*

[BOOTH]: *That would be the essence of Judge Harrington's order.*

[PROSECUTOR]: *And you discussed that with him?*

[BOOTH]: *Correct.*

[PROSECUTOR]: *Now he understood it and directed you to file your motion for reconsideration?*

[BOOTH]: *That's correct.*

[PROSECUTOR]: ... [Y]ou never told him did you to violate Judge Harrington's order, correct? I mean you never said that?

[BOOTH]: No, I never said that.

[PROSECUTOR]: You didn't agree with Judge Harrington's order, correct?

[BOOTH]: That's correct.

[PROSECUTOR]: *But you understand that, until the Court of Special Appeals rules, it's still in effect?*

[BOOTH]: *That's correct.*

[PROSECUTOR]: *And under the terms of that order he could not go buy a firearm, correct?*

[BOOTH]: *That's correct.*

[PROSECUTOR]: *And you never told him that he could?*

[BOOTH]: *No, I never told him that he could.*

[PROSECUTOR]: ... *[Y]ou would have never told him he could go and buy a gun when Judge Harrington said no guns for a prohibit[ed] person, correct?*

[BOOTH]: *I would have cautioned him against it.* (Emphasis added.)

The court said:

"[O]ne way to have truthfully filled out the application was that, when you got to question 8, you could instead of saying "yes" or "no," you could say, "see footnote." The footnote says, "This is what Judge Harrington said. I think she's wrong. In fact, I've appealed her all the way to the Supreme Court of Mars. But here are the facts. So I'm not making a false statement and I'm not misleading anybody," correct?

Booth reasoned that he was "not conversant enough with that form to even know there's a footnote section." The court replied: "Even if there's not, you take a separate piece of paper, you write out whatever it is you think they need to know and you attach it. It just seems to me folks have been doing that for the last 70 years in responding to recent federal forms."

Furda was recalled. He said that he was not aware of a footnote section on the Application, explaining: "It was yes/no answers as far as I've ever filled one out."

Defense counsel informed the court that "there are apparently documents from Potomac Ridge, which are currently under seal" and that were part of the Protective Order Case. The trial judge said that he had not "looked at them," nor had he "looked at that file," explaining: "[N]obody asked me to do anything, so I didn't do anything." Defense counsel said: "Well, that's fine, Your Honor." Nevertheless, he asked the court to take judicial notice of "five or six pages" of the Potomac Ridge records. The State informed the court that "that file is up at the Court of Special Appeals," and that the prosecutor had "advised Mr. Booth that the Court of Special Appeals was not going to send it back to Montgomery County

for this hearing even though I asked them to." The following exchange is noteworthy:

THE COURT: Well, here are my practical problems. I don't have [the records], so I can't see them. Putting that aside, I don't know what they say, so I don't know whether there would be any objection to my reading them. But I don't physically—you want me to call Chief Judge Krauser and ask him to send something to me?

[DEFENSE COUNSEL]: Your Honor, I have the pages if Your Honor—

THE COURT: Well, is there an objection?

[PROSECUTOR]: There is an objection, Your Honor.[12]

THE COURT: Okay.

Appellant did not make a proffer as to the content of the Potomac Ridge records. In declining to take judicial notice of the records, the court said:

Well, this is where I am.... [T]his is a perjury charge. This is a false statement charge. It seems to me that if there's been a judicial determination that something happened, even if that judicial determination is wrong, okay, and a question says, has it happened, the issue is was there proper disclosure.

That was really my question to you is I understand that your client in his heart believes Judge Harrington is wrong. There's a judicial determination made and even if it's not correct, it was made....

... If Judge Harrington said he's been committed, and somebody said have you ever been committed, it would be difficult, not impossible, difficult to answer no to the question and have the no be truthful, even if you didn't agree with it.

---

12. The State objected, despite its earlier request for the Potomac Ridge records. Presumably referring to Furda's companion appeal in the Protective Order Case, the prosecutor claimed that it was within the purview of this Court to determine whether appellant had been committed to a mental institution.

Just like in a bank robbery case, you are convicted of the crime, but you're innocent. And later you could prove it and all these things. But in filling out an application to Lockheed Martin and an application for security clearance, they're going to ask you have you ever been convicted of a felony. You have to say, under my hypothetical, yes, comma but see the 42 attachments.

It doesn't have to be necessarily a place that says, please enter your footnotes here. People file federal income tax returns all the time, all the time with extra footnotes, pages, statements of position, explanations, so as to make, to avoid what some argue is the perjury trap.... Or you can do all kind of things. But you can't just say, no.

So that's a long-winded way of saying that here's my problem with taking judicial notice at this time. One, I don't have the documents. Two, they may or may not be hearsay, possibly....

Thereafter, the defense rested, and the parties proceeded to closing.

The State explained that appellant "answered no to question no. 8, that is the basis of the case, that is the basis of the prosecution of that statement is demonstrably false...." With regard to willfulness, the State pointed to the Order of November 7, 2007, and argued: "Mr. Furda knew exactly what he was doing and kn[e]w that he could not legally possess firearms and was prohibited from possessing them." The State added: "When someone says, you can't do this or you can't do that, and a person just ... disagrees with it. But when a person ... in authority [says] that[,] there's an obligation to follow through on that and obey that order."

Defense counsel countered that "the bottom line is [appellant] was firmly convinced that he was eligible to purchase a firearm." In response to the court's inquiry as to whether appellant's belief had to be "objectively reasonable," defense counsel answered: "I think it is in this [case] objectively reasonable." Further, defense counsel said that if appellant had a subjective belief that he was answering truthfully, the

court should acquit him. He also complained that "Judge Harrington's ruling was made as a result of a motion hearing, 15 minutes per side. And that's it. And there was no testimony.... It's a civil order." Further, defense counsel argued:

Mr. Furda did not make a false statement willfully. [H]e firmly believes that the order is wrong. That he was not committed and that he was able to say that on this sheet.

And, you know, footnote notwithstanding, he did attempt to provide some explanatory basis for it, being the motion which he took to the shop.

The court found the following "as a first-level fact" (emphasis added):

[A]t the time that Mr. Furda filled out the application for possessing a firearm, ... he had been committed involuntarily to a mental institution .... [and] he knew not only that he had been involuntarily committed to a mental institution, *he knew that there had been a finding to that effect by the Circuit Court* for Montgomery County, Maryland.

*... [A]t the time Mr. Furda filled out his application for firearms on January 21 [sic], 2008, he knew that Judge Harrington's order that was [docketed] on November 9, 2007, had not been vacated, modified, stayed, or overturned. That is to say, he knew it was in effect.*

... [H]e had asked, through counsel, did Judge Harrington reconsider her decision. But *he knew at the time that he filed his application on January 24, 2008, that he knew at the very least that Judge Harrington had not granted his request.*

... Mr. Furda made a false statement on his application of January 24, 2008, when he said in answer to question 8, that he had never been committed to a mental institution. He knew that was false.

... Mr. Furda attempted to deceive the Maryland State Police in answering question 8 falsely because he wanted a gun and he didn't want to put down the truth.

As to the perjury charge, the court found that "Mr. Furda's conduct was willful." It said: "The Court finds that he ... willfully, knowingly, and frankly voluntarily made a false statement as a material fact knowing that it was false." Further, the court determined that "subjectively Mr. Furda did not have a good faith, honest belief that the contents of his affidavit were true." Indeed, the court said: "I find as a fact to the opposite. He knew they were false. He didn't care." The court continued:

> I find that the State has proven each and every material [fact]. *I also find that the misstatement, the false statement was not the result of confusion or an honest mistake. Mr. Furda knew full well what Judge Harrington had ruled.* Mr. Furda knew darn well that he had been involuntarily committed to Potomac Ridge. He was not free to leave during that time period. He knew it. It's a fact.

> \* \* \*

> I find that he knew the statement was false at the time it was given. I find that it was material and that he intended to induce the State Police to give him a gun permit because he wanted a gun. (Emphasis added.)

With respect to the false statement charge, the court found that Furda "knowingly gave false information and knowingly made a material misstatement" and that "he had the specific intent to violate the law ... at the time he did it beyond a reasonable doubt."

Rejecting the defense of reliance on counsel, the court said:

> I am persuaded by the evidence that the defense of counsel defense or the reliance of counsel defense is factually inapplicable to this case. I find as a fact he did not rely on any advise [sic] of counsel when he filled out the application. So I recognize the legal applicability of it but reject it on the facts.

> For all those reasons I find the defendant guilty on both counts of the criminal information. . . .

Defense counsel then informed the court: "Mr. Furda has asked me if he could ... mention to the Court ... that when he did go to Gilbert's and he did have the motion ... he did ask if it could be attached to the application.... And he was told at Gilbert's, 'No, that's not the way it's done.'" The court said:

Well, respectfully, I didn't hear that from the stand and that was his time to say it. And, respectfully, probably nobody could have stopped him from writing. I know there may not be a section on it that says "Please write footnotes here," but just like there's no such statement on U.S. Income Tax Returns or other statements made to federal agencies, people have been doing it for years to avoid what we have here. It's not rocket science. It's not novel. It's not hindsight by 20/20. It's people are careful when you make a statement to a federal or state agency that it's scrupulously true. But anyway, all right, you've told me that. He doesn't need to tell me that.

On September 2, 2008, appellant filed a Motion for New Trial, which the State opposed. After a hearing on October 14, 2008, the court denied the motion (docketed October 16, 2008).

At sentencing on October 30, 2008, the court said:

The Court is most troubled by this case because the Court finds that Mr. Furda totally lacks any credible or cognizant amount of acceptance of personal responsibility....

The Court also finds that Mr. Furda did not testify candidly when he testified during his trial. He told me then, he told me now, he was not aware of Judge Harrington's order. To be blunt, I do not believe him....

He has a history and pattern of knowingly, willfully, intentionally, disobeying lawful orders of judges of the State of Maryland.

We shall include additional facts in our discussion.

### DISCUSSION

### I.

 In essence, appellant contends that the evidence was legally insufficient to convict him of perjury or false statement because, in the Protective Order Case, the court erred in finding that, under federal law, he had been "involuntarily committed to a mental institution." [13] Appellant complains that he "was charged with perjury and false application under Maryland State law for supposed violations of State law while filling out a Maryland State firearm form," yet the Order of November 7, 2007, "declar[ed] him to be a prohibited person pursuant ... to Federal law." In Furda's view, the federal prohibition, if any, could not "be used to convict him for improperly filling out his State form[.]" In Furda's view, the State erred in prosecuting him under Maryland law, because he "was never found to be 'committed' under Maryland State Law," and "the State conceded that [appellant] was not barred under State law." According to Furda, he was merely "guilty" of "disobeying a Court Order[ ] ... not perjury or providing false information...." He claims that the Order of November 7, 2007, was "issued in a Civil Matter," [14] and was merely "the product of argument but had no sworn witnesses and no independent testimony submitted."

Further, appellant suggests that the Application did not make clear whether he was to answer Question 8 as it pertained to Maryland law or federal law. Claiming that "he lacked expertise about statutory schemes to know that the question pertained to both federal and State law," appellant maintains that "there is nothing in State law that prohibited

---

**13.** Appellant argues that, under federal law, a commitment may only occur after "a hearing or 'formal' proceeding by some 'lawful authority,'" and does not include emergency evaluations. We need not belabor these contentions, as they are the subject of the companion appeal. It is sufficient to say here that we agree with Furda that the court erred in concluding that he had been committed.

**14.** Appellant filed the motion in his criminal case, which we discuss in the companion appeal.

him from applying for a firearm," and his statement on the Application that he "had never been committed" was truthful under Maryland law.

Furda continues: "There was simply no evidence presented by the Government to show the required specific intent on the part of Mr. Furda to lie." To the contrary, argues Furda, the court recognized that appellant " 'believed Judge Harrington is wrong.' " Therefore, appellant claims that "he did not willfully lie on the form" and "*did not have* the requisite intent to commit perjury." With regard to the false statement charge, appellant argues that there was "no evidence presented that clearly demonstrated beyond a reasonable doubt that there had been a 'false statement,' " because there was no evidence that he was either "committed" or a "mental defective," and the only evidence presented by the State as to this issue was "the seriously flawed Court Order."

Mindful that the court below "suggested" that appellant could have provided more than a "yes" or a "no" answer in response to Question 8, by adding a footnote or an attachment to his Application, appellant insists that "the State never proved beyond a reasonable doubt, that Mr. Furda was allowed to either attach documents to the Application, or that there was a comment section where the Defendant could explain his answers." In appellant's view, it was the State's burden to present evidence that such footnotes or attachments were permissible.

According to the State, "the fact that Judge Harrington found that Furda had been 'committed' is sufficient evidence of 'commitment' to sustain Furda's convictions for perjury and misstatement in a firearms application—regardless of whether Judge Harrington's conclusion was correct or valid." In its view, "it is not relevant whether Judge Harrington's Order was unsupported by the facts, erroneous in its legal conclusion, or void for lack of jurisdiction." Rather, argues the State, "the fact that the Order finding that he had been 'committed' was in effect at the time Furda filed his firearms

application constituted sufficient proof of the falsity of Furda's statement."

Moreover, the State underscores that "the federal law proscribing false statements in firearms applications is construed broadly to effect full and honest disclosure." In support of its position that "there was abundant evidence of Furda's knowledge that he had been committed," and that Furda "answered [the Application] falsely in order to deceive the Maryland State Police into approving his application," the State points to "Furda's testimony . . . that he had been involuntarily transferred and admitted to Potomac Ridge"; Furda's presence at the motion hearing on November 7, 2007; defense counsel's "testimony that he 'share[d] the contents of Judge Harrington's order with [his] client' . . . and that he had discussed with Furda that he was a prohibited person because Judge Harrington's Order had deemed him committed"; Furda's admission that he thought his motion for reconsideration of the Order of November 7, 2007, was pending when he submitted the Application; the "evidence that Furda spent 45 minutes in the gun store" discussing the motion for reconsideration with the store owner; and "Furda's testimony that he understood that persons who had been committed were ineligible to hold firearms." [15]

The State also disputes Furda's argument that Question 8 on the Application ("Have you ever been . . . committed to a mental institution?") was "so ambiguous in terminology that [Furda] cannot be found guilty as a matter of law, because even if false under federal law, his answer was truthful under Maryland law." It asserts that, "in the light most favorable to the State, there was ample evidence that Furda understood the form's use of 'commitment' to include any person, like him, who had been determined by a judge to have been 'committed.'" In this regard, it posits that because Furda "attended the hearing before Judge Harrington, and discussed with

---

15. In addition, the State maintains that "[t]here was evidence of 'commitment' in addition to the Order." It points out that appellant "conceded that he had not stayed at Potomac Ridge voluntarily."

counsel the Order and Motion for reconsideration, there is a reasonable inference that Furda ... understood Question 8's reference to commitment to mean commitment within the meaning of the federal statute."

In addition, the State contends that the "objective context of the question" removed any alleged ambiguity, because the Application "made clear that its purpose was to elicit disclosure of any and all conditions that would lawfully prohibit a person from buying a firearm." The State also points out that the word "commitment" was not used in a technical sense in the Application, and is "a term of common understanding."

According to the State, the false application "statute encompasses a broader range of statements than does the perjury statute." Because statements need not be false to be misstatements, the State maintains that the false application statement may stand even if the evidence of perjury was insufficient.

Appellant replies: "It would be a miscarriage of justice for this Court to follow the State's suggestion ... that even if Judge Harrington's Order was found to be invalid, which this Court should find [in the companion appeal], that it should, nevertheless, still provide the basis for his conviction." According to Furda, "if the Order is found to be not valid or not legally binding, then the interest of justice would demand that it cannot be the basis for the criminal conviction ... of Mr. Furda."

## II.

We have already quoted portions of 18 U.S.C. § 922. We turn to the applicable Maryland criminal statutes.

C.L. § 9–101, which proscribes perjury, provides, in part:

### § 9–101. Perjury.

(a) *Prohibited.*—A person may not willfully and falsely make an oath or affirmation as to a material fact:

(1) if the false swearing is perjury at common law;

(2) in an affidavit required by any state, federal, or local law;

(3) in an affidavit made to induce a court or officer to pass an account or claim;

(4) in an affidavit required by any state, federal, or local government or governmental official with legal authority to require the issuance of an affidavit; or

(5) in an affidavit or affirmation made under the Maryland Rules....

P.S. § 5–139 prohibits false information or a material misstatement in a firearm application. It states:

**§ 5–139. False information or misstatement in application.**

(a) *Prohibited.*—A person may not knowingly give false information or make a material misstatement in a firearm application for a dealer's license.

(b) *Penalty.*—A person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 3 years or a fine not exceeding $5,000 or both.

The Maryland Criminal Pattern Jury Instructions—4:26.1 sets forth the following elements with respect to the crime of Perjury by Affidavit:

The defendant is charged with the crime of perjury by affidavit. Perjury is the deliberate making of a false affidavit. An affidavit is a written document, the contents of which are affirmed to be true under penalty of perjury. In order to convict the defendant of perjury by affidavit, the State must prove:

(1) that the defendant declared under the penalty of perjury that a written document was true;

(2) that the writing contained a false statement;

(3) that the false statement was given wilfully, rather than as a result of confusion or honest mistake;

(4) that the defendant knew the statement was false at the time it was given; and

(5) that the false statement was material, that is, it related to the reason why the affidavit was prepared.

As the Court of Appeals noted in *McGarvey v. McGarvey,* 286 Md. 19, 25, 405 A.2d 250 (1979), perjury involves a "corrupt sworn statement made without sincere belief in its truthfulness...." *See also Palmisano v. State,* 124 Md.App. 420, 431, 722 A.2d 428 (noting that the crime of perjury "involves a wilful and false statement, about a material matter, that satisfies the statutory oath requirement"), *cert. denied,* 353 Md. 473, 727 A.2d 383 (1999); *see also* RICHARD P. GILBERT & CHARLES E. MOYLAN, JR., MARYLAND CRIMINAL LAW: PRACTICE AND PROCEDURE § 9.3 (1983 & 1985 Supp.) ("The crime [of perjury] is committed in attempting to deceive, coupled with the carrying out of the plan. Hence, it is the intent that is punished, not the result.").[16]

▮ Ordinarily, "statements which present legal conclusions are considered opinion, and cannot form the basis of a perjury conviction." *United States v. Endo,* 635 F.2d 321, 323 (4th Cir.1980). Moreover, perjury usually applies only to adjudicative facts; generally, " 'it is doubtful that false testimony' " as to " 'ultimate facts' " can support a perjury conviction, because ultimate facts, which involve " 'legal definitions' " applied to facts, are ordinarily " 'beyond the realm of common knowledge....' " *Id.* (Citation omitted).

C.L. § 9–101 does not define "willfully," nor does P.S. § 5–139 define "knowingly." In *Greenwald v. State,* 221 Md. 235, 244, 155 A.2d 894 (1959), however, the Court said: "[T]he word 'wilfully' is of similar import to the word 'knowingly' and is the same in substance and effect." In order for a false oath to be willful, it "must be deliberate and not the result of surprise, confusion or bona fide mistake." *State v. Devers,* 260

---

**16.** With regard to the element of materiality in the context of false testimony, we have said: " 'The most common test ... is whether the false testimony could have affected "the course or outcome" of the proceeding. Superfluous or otherwise unnecessary testimony, though false, does not constitute perjury.' " *Palmisano,* 124 Md.App. at 429, 722 A.2d 428 (citation omitted).

Md. 360, 372, 272 A.2d 794 (relying on previous common law interpretation of "willful" under Art. 27, §§ 435, 437), *cert. denied,* 404 U.S. 824, 92 S.Ct. 50, 30 L.Ed.2d 52 (1971), *overruled on other grounds by In re Petition for Writ of Prohibition,* 312 Md. 280, 539 A.2d 664 (1988). Notably, " '[a] wrongful intent is an essential ingredient' " of perjury. *State v. Levitt,* 48 Md.App. 1, 10 n. 6, 426 A.2d 383 (1981) (citation omitted).

Furda does not dispute that the evidence was sufficient to prove that he averred in an affidavit that he had never been committed to a mental institution; that the affidavit was part of a firearm application; and that the statement was material. But, he argues that the state did not establish the element of falsity, nor did it "present any evidence that negated Mr. Furda's testimony about his own belief that he was correct" that he was never committed. He also insists that the State never proved that he acted willfully or knowingly.

As we have indicated, we have held in the companion appeal that, in the Protective Order Case, the court erred in its Order of November 7, 2007, by finding that appellant had been involuntarily committed to a mental institution within the meaning of federal law. The question is whether that error has any bearing in regard to the appeal in the Perjury Case.

In our view, the court's error in regard to the Order of November 7, 2007, does not control the outcome of the Perjury Case. Appellant was not entitled to represent on the Application that he had never been "committed." For reasons elucidated below, the evidence was sufficient for a factfinder to conclude that Furda knowingly and willfully made a false statement in the Application.

In the Protective Order Case, the court held a hearing on November 7, 2007, to consider, *at appellant's request,* his motion for the return of his weapons. Appellant was present at the hearing. On the same date, the court issued its Order, finding that Furda was prohibited under federal law from possessing firearms because he had been "involuntarily committed to a mental institution." Appellant was apprised of the

court's ruling and asked the circuit court to reconsider it. Furda thought that the motion for reconsideration was still pending when he signed the Application on January 24, 2008. Appellant's belief that his motion for reconsideration was still pending further established his knowledge that the Order of November 7, 2007, had not been vacated.

Yet, despite Furda's knowledge of the Order of November 7, 2007; his knowledge of the pending motion for reconsideration; and his attorney's cautionary advice, Furda answered "No" to Question 8 on the Application, asking whether he had ever been "committed to a mental institution." It is telling that Furda clearly understood that he would not be approved for the purchase of the firearm unless he answered "No" to Question 8. Moreover, Furda never testified that he believed that he was at risk of committing perjury or a false statement unless he answered "No."

To be sure, appellant disagreed with the circuit court's ruling of November 7, 2007. Nevertheless, it is beyond dispute that Furda knew his answer was directly contrary to Judge Harrington's ruling. Until such time as the Order of November 7, 2007, was stayed, reversed, or vacated, it was conclusive and binding on Furda. That it is the cornerstone of our judicial process. Therefore, appellant could not deliberately disregard that Order by answering Question 8 in a way that was contrary to the Court's ruling, even if he personally believed it was wrong.

"It is beyond question that obedience to judicial orders is an important public policy." *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber,* 461 U.S. 757, 766, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983). As the Court of Appeals stated long ago: "If the judgment of the Court is erroneous, the remedy is by appeal, and until reversed on appeal, the judgment is binding on the parties to the suit." *Roessner v. Mitchell,* 122 Md. 460, 466, 89 A. 722 (1914). *See Donner v. Calvert Distillers Corp.,* 196 Md. 475, 489, 77 A.2d 305 (1950) (recognizing, in a contempt case, that an "order may be based upon erroneous facts ... or an erroneous conception of the

law.... Nevertheless, it must be obeyed until such time as it is stricken out on application, or reversed on appeal ....") (citation omitted); *Dugan v. Mayor of Baltimore,* 70 Md. 1, 7, 16 A. 501 (1889) (finding, in a partition case, "[i]f the judgment of the court is erroneous, the remedy is by appeal, and until reversed on appeal the judgment is binding on the parties to the suit"); *Link v. Link,* 35 Md.App. 684, 688, 371 A.2d 1146 (1977) (noting that a party must obey a judgment for alimony while the case is on appeal); *see also United States v. Crawford,* 329 F.3d 131, 138 (2d Cir.2003) ("[I]t is well settled that 'persons subject to an injunctive order ... are expected to obey that decree until it is modified or reversed, even if they have proper grounds to object to the order.'") (citation omitted), *cert. denied,* 540 U.S. 881, 124 S.Ct. 329, 339, 157 L.Ed.2d 147 (2003); *Chapman v. Pacific Tel. & Tel. Co.,* 613 F.2d 193, 197 (9th Cir.1979) (affirming a criminal contempt order against an attorney, noting that "[a]n attorney who believes a court order is erroneous is not relieved of the duty to obey it. The proper course of action, unless and until the order is invalidated by an appellate court, is to comply and cite the order as reversible error should an adverse judgment result"); *American Mut. Life Ins. Co. v. Mason,* 159 Ind. 15, 64 N.E. 525, 525 (1902) ("[T]he judgments of the courts of any state having jurisdiction over the subject-matter and of the parties are conclusive on the merits in the other states of the Union until reversed on appeal."); *State ex rel. Jefferson County Children Services Bd. v. Hallock,* 28 Ohio St.3d 179, 502 N.E.2d 1036, 1039 (1986) (noting that court's judgment is valid "unless and until it is reversed on appeal").

The Supreme Court's decision in *Walker v. City of Birmingham,* 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967), is persuasive. In that case, an Alabama court enjoined the petitioners from participating in public demonstrations and civil rights marches on the streets, without a permit. The permit had been previously denied, and no further request was made for a permit after the injunction was issued. Nor did the petitioners move to challenge or dissolve the injunction. Instead, the petitioners disobeyed the injunction and

were later found guilty of contempt. In affirming the convictions, the lower courts refused to consider the petitioners' constitutional challenges to the injunction or the underlying ordinance on which it was based. *Id.* at 308–313, 87 S.Ct. 1824.

When the case reached the Supreme Court, it said, *id.* at 315, 87 S.Ct. 1824:

> In the present case ... we are asked to hold that this rule of law, upon which the Alabama courts relied, was constitutionally impermissible. We are asked to say that the Constitution compelled Alabama to allow the petitioners to violate this injunction, to organize and engage in these mass street parades and demonstrations, without any previous effort on their part to have the injunction dissolved or modified, or any attempt to secure a parade permit in accordance with its terms.... [W]e cannot accept the petitioners' contentions in the circumstances of this case.

Notably, the Supreme Court acknowledged "substantial constitutional issues" concerning the ordinance. *Id.* at 316, 87 S.Ct. 1824. But, it noted, *id.* at 316–17, 87 S.Ct. 1824, that the petitioners "did not even attempt to apply to the Alabama courts for an authoritative construction of the ordinance. Had they done so, those courts might have given the licensing authority granted in the ordinance a narrow and precise scope...." Similarly, it discerned legitimate issues concerning "the breadth and vagueness of the injunction...." *Id.* at 317, 87 S.Ct. 1824. Nevertheless, the Court said, *id.*: "But the way to raise that question was to apply to the Alabama courts to have the injunction modified or dissolved. The injunction in all events clearly prohibited mass parading without a permit, and the evidence shows that the petitioners fully understood that prohibition when they violated it."

Of import here, the Supreme Court squarely rejected the petitioners' claim that they were "free to disobey the injunction" because of its constitutional defects. *Id.* Looking to other cases previously decided by the Supreme Court, it said, in words that resonate here:

These precedents clearly put the petitioners on notice that they could not bypass orderly judicial review of the injunction before disobeying it. . . .

\* \* \*

The rule of law that Alabama followed in this case reflects a belief that in the fair administration of justice no man can be judge in his own case, however exalted his station, · however righteous his religion.[1] This Court cannot hold that the petitioners were constitutionally free to ignore all the procedures of the law and carry their battle to the streets. One may sympathize with the petitioners' impatient commitment to their cause. *But respect for judicial process is a small price to pay for the civilizing hand of law, which alone can give abiding meaning to constitutional freedom.* *Id.* at 320–21, 87 S.Ct. 1824 (emphasis added). *See also Howat v. Kansas,* 258 U.S. 181, 189–90, 42 S.Ct. 277, 66 L.Ed. 550 (1922) (stating that an injunction must be obeyed, "however erroneous the action of the court may be. . . . [I]t is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review . . . its orders . . . are to be respected. . . .").

*Lewis v. United States,* 445 U.S. 55, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980), makes a similar point in a case involving guns. There, the Supreme Court considered whether a defendant's prior conviction, "flawed because he was without counsel," *id.* at 56, 100 S.Ct. 915, could nonetheless "constitute the predicate" for a conviction under § 1202(a)(1), as amended, of Title VII of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 1202(a)(1). That provision bars possession of a firearm by a convicted felon. In reviewing the legislative history of the provision in issue, the Court said, *id.* at 62, 100 S.Ct. 915: "[W]e find nothing to suggest that Congress was willing to allow a defendant to question the validity of his prior conviction as a defense to a charge under § 1202(a)(1)." The Court added, *id.* at 63, 100 S.Ct. 915:

The legislative history . . . affords no basis for a loophole, by way of a collateral constitutional challenge, to the broad

statutory scheme enacted by Congress. Section 1202(a) was a sweeping prophylaxis, in simple terms, against misuse of firearms. There is no indication of any intent to require the Government to prove the validity of the predicate conviction.[17]

The Supreme Court also said: "Finally, it is important to note that a convicted felon is not without relief." *Id.* at 64, 100 S.Ct. 915. It pointed out that a disqualified person could seek relief directly under the statute. And, of particular import here, the Supreme Court said, *id.:* "Also, petitioner, before obtaining his firearm, could have challenged his prior conviction in an appropriate proceeding in the ... State courts." As if to emphasize that point, the Court reiterated, *id.* at 67, 100 S.Ct. 915: "Again, it is important to note that a convicted felon may challenge the validity of a prior conviction ... before obtaining a firearm."

*Lewis* underscores our point. Appellant was not without a remedy. Apart from any recourse under the federal statute, appellant lodged an appeal to this Court and could have awaited the result of that appeal before submitting the Application. Moreover, if the government is not required to prove the validity of a prior conviction in order to achieve a conviction under 18 U.S.C. § 1202(a), it follows that the validity of Judge Harrington's Order was not dispositive of whether appellant falsely answered Question 8.

*United States v. Graves,* 554 F.2d 65 (3rd Cir.1977), is also informative as to this point. In a state court, the defendant was convicted of larceny, a crime "punishable by a term of imprisonment exceeding one year." *Id.* at 67. Graves never challenged the conviction. *Id.* About a year later, he was indicted, *inter alia,* for violating 18 U.S.C. § 922(a)(6) "in connection with the purchase of a shotgun when he certified on a registration form that he had not been convicted of a crime punishable by imprisonment for a term of at least one

---

17. The Court noted, *id.* at 64, 100 S.Ct. 915, that each title of the Act "prohibits categories of presumptively dangerous persons" from possessing firearms. It cited, among other provisions, 18 U.S.C. § 922(g).

year although, in fact, he knew that he had been." *Id.* In addition, he was indicted on one count for a violation of 18 U.S.C. § 1202(a)(1), barring possession of a firearm by a convicted felon.

Prior to trial, Graves moved to dismiss the indictment, arguing that the larceny conviction "had not been constitutionally obtained," *id.*, because he was a juvenile when he was arrested and he was denied various "procedural safeguards mandated by due process. . . ." *Id.* at 67–68. In his view, the constitutionally defective conviction could not be the basis for criminal liability. *Id.* at 68. The district court rejected Graves's argument and convicted him. *Id.*

On appeal, the Third Circuit said: "Inspection of § 922(a)(6), and Title IV [of the Gun Control Act of 1968] as a whole, suggests that a person who is a convicted felon must divulge the fact of his conviction, regardless of whether or not he believes it to be unconstitutional." *Id.* at 71. According to the court, although "such an interpretation of [§] 922 tangentially implicates a conviction which may at some future time be deemed constitutionally infirm . . . two components of Title IV strongly indicate that Congress intended that such a conviction could conduce to liability under the statutes." *Id.*

Noting that 18 U.S.C. § 922(h)(1) [now (n) ] prohibits firearm possession for persons under indictment for a crime punishable by a term exceeding one year, despite the presumption of innocence, *id.* at 71–72, the court said, *id.* at 72:

Section 922 would appear to provide some evidence of Congressional intent concerning the issues in this case. This is so since there are a number of similarities between an indictment and a conviction claimed to be unconstitutional. *Both may result in the eventual vindication of the defendant, thereby dissolving the disability with respect to firearms. The restriction in either case may be only a temporary one which will be removed when a court frees the defendant from the scrutiny of the criminal justice system* or when the executive branch grants a dispensation. To argue, as does Graves, that Congress intended to impose no

disability on persons with outstanding convictions that they assert are unconstitutional, but to impose a disability on persons under indictment, would be to charge the legislative framers with a manifest inconsistency. We cannot discern that Congress sought to design such an asymmetrical statutory scheme. (Emphasis added.)

The *Graves* Court also said, *id.* at 75:

*The most obvious way for a person to remove doubts about his ability to deal with guns properly is to challenge the source of the doubts—namely, the prior conviction. It is reasonable to assume, therefore, that Congress expected a convicted felon to undergo the relatively modest inconvenience of a restriction on firearms use until he has obtained a judicial invalidation of his conviction or has secured an executive authorization lifting that restriction.* To divine any other objective on the part of Congress might undercut the safeguards afforded by the Gun Control Act and increase the exposure of the public to continuing threats of crimes of violence. This we are unwilling to do. (Emphasis added.)

The logic of the cases discussed above applies here. Appellant asked the circuit court in the Protective Order Case to determine whether he was entitled to the return of his weapons. He obtained an adverse ruling, as we have discussed, with which he rightfully disagreed. Clearly, appellant was entitled to challenge the ruling by way of an appeal. But, he could not flout a judicial determination with which he disagreed. Before making a representation on the Application, under oath, that was contrary to the court's ruling, he should have "undergo[ne] the relatively modest inconvenience," *id.*, of awaiting the outcome of his appeal he took to challenge the ruling. That is what our judicial process required.

In considering whether Furda was entitled to answer Question 8 consistent with his personal belief that he was not committed, *United States v. McFadden*, 211 F.Supp.2d 234 (D.Me.2002), is relevant. It highlights the significance of Furda's knowledge of the status of his admission to a mental

health facility—i.e., that, according to the court, it constituted a commitment.

In *McFadden*, the defendant answered "in the negative" as to a question on a federal form asking whether he had ever been committed to a mental institution. *Id.* at 234. He was subsequently charged with "knowingly making a false statement in connection with the purchase of firearms," in violation of 18 U.S.C. § 922(a)(6), and with possession of firearms after "having been committed to a mental institution," in violation of 18 U.S.C. § 922(g)(4). *Id.*[18]

The facts showed that McFadden "was presented on February 20, 1998, at Rusk State Hospital on a Mental Health Warrant For Emergency Detention issued by a Texas Magistrate, and on an Application for Detention of a Person as Mentally Ill made by a Texas peace officer." *Id.* at 234–35. He was detained upon a physician's finding that he was mentally ill and likely to cause serious harm to himself and others. *Id.* at 235. A judge issued an Order of Protective

---

18. For convenience, we shall restate these provisions:

§ 922. Unlawful acts.

(a) It shall be unlawful—

\* \* \*

(6) for any person in connection with the acquisition or attempted acquisition of any firearm or ammunition from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, knowingly to make any false or fictitious oral or written statement or to furnish or exhibit any false, fictitious, or misrepresented identification, intended or likely to deceive such importer, manufacturer, dealer, or collector with respect to any fact material to the lawfulness of the sale or other disposition of such firearm or ammunition under the provisions of this chapter[.]

\* \* \*

(g) It shall be unlawful for any person—

\* \* \*

(4) *who has been adjudicated as a mental defective or who has been committed to a mental institution*

\* \* \*

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce. . . .

Custody on February 23, 1998, and a probable cause hearing was held on February 26, 1998. *Id.* McFadden was released on February 26, 1998, based on the decision of his treating physician. *Id.* at 236.

The court concluded that, at the time McFadden was in possession of the weapons, he was "a person within the scope of the broad 'prohibition against ownership of firearms by "mentally unstable" or "irresponsible" persons,'" and thus violated 18 U.S.C. § 922(g)(4). *Id.* (citations omitted). However, the court acquitted the defendant under § 922(a)(6). Of import here, it reasoned, *id.* (italics and boldface added):

> *There is no evidence in the record from which the Court can conclude,* beyond a reasonable doubt or otherwise, *that this Defendant knew that the proceedings he had undergone in Cherokee County, Texas constituted a commitment* under the provisions of the statute pursuant to which he is charged with that [false statement] offense. *The most that can be said from the evidence is that he knew that he had been through a proceeding in Texas resulting in his detention at a mental institution.*
>
> **There is nothing to show, however, that thereafter at any time he was advised or otherwise came by knowledge that those proceedings and that detention constituted a commitment under the federal statute.** Indeed, it is appropriate to note that various panels of federal appellate judges cannot agree as to whether particular emergency detention proceedings on the basis of alleged mental illness constitute "commitments" under the federal statute.... *It strains too far to expect, in the absence of clear proof of his knowledge of that fact, that this Defendant would have a discrete understanding at the time he executed the affidavit in question that the circumstances of the prior Texas proceedings constituted a commitment* which required him to answer the pertinent question in the affirmative or be guilty of a felony offense.[ ]

If Furda had merely been hospitalized or detained for evaluation in 2003, and then, without having obtained a court

ruling, applied for a firearm, his answer of "No" to the question "have you been committed?" would be akin to the facts in *McFadden.* Under that scenario, it might be difficult for the State to establish whether Furda knew his hospitalization was a "commitment." The facts of this case are markedly different, however.

In contrast to the defendant in *McFadden,* appellant was expressly "advised" by the court in the Protective Order Case, and thus "came by knowledge," in the way of the Order of November 7, 2007, that his emergency mental health evaluation constituted a commitment. Indeed, it was Furda who, in the Protective Order Case, asked the court to return his weapons, which required the court to determine whether appellant had previously been committed. The court ruled that Furda was barred under federal law from possessing the weapons, because he had been committed. In the Perjury Case, Judge Rubin found that appellant knew of that ruling at the time he completed the Application; the evidence showed "clear proof" of appellant's knowledge that a court regarded his previous hospitalization as a commitment.

Moreover, the evidence in the Perjury Case indisputably showed that appellant had a "discrete understanding" of Judge Harrington's ruling. Indeed, Furda asked his attorney to file a motion for reconsideration, and took that motion with him to Gilbert's Guns. In addition, his attorney discussed with appellant that Judge Harrington had "ruled that [Furda] was a prohibit[ed] person because he was involuntarily committed . . .," and "cautioned" Furda against trying to buy a gun. And, the Application made clear that the answer of "Yes" to Question 8 would preclude appellant's purchase of the firearm.

Appellant claimed that he was unaware that, in the Protective Order Case, the court had denied his motion for reconsideration when he signed his Application.[19] That fact is of no

19. It was Furda's "duty to keep [himself] informed of the status of [his] case." *See Bland v. Hammond,* 177 Md.App. 340, 359, 935 A.2d 457 (2007) (declining to vacate judgment when Bland's attorney did not keep her apprised of the status of her case, because there was no

consequence. Even if Furda believed the motion for reconsideration was still pending, that would also mean that Furda knew the court's initial determination (i.e., that Furda had been committed) remained in effect.

Other cases are worthy of mention. We pause to review them.

In *United States v. Seidenberg*, 420 F.Supp. 695 (D.Md. 1976), *aff'd*, 577 F.2d 738 (4th Cir.1978), *cert. denied*, 439 U.S. 903, 99 S.Ct. 268, 58 L.Ed.2d 249 (1978), the defendant was committed to a mental institution operated by the State of Maryland. *Id.* at 696. Years later, he "acquired firearms from federally licensed dealers," and was subsequently charged under 18 U.S.C. § 922(a)(6) with having "knowingly made a false and fictitious statement likely to deceive such dealer with respect to a material fact as to the lawfulness of the sale, by signing a sworn statement" that he had never been adjudicated mentally defective or committed to a mental institution. *Id.* The defendant moved to dismiss the charges, alleging that his prior commitment was invalid because it "was unconstitutional and that, therefore, such commitment must be treated as nonexistent for purposes of any alleged violations of section 922(a)(6)." *Id.* The trial court denied the motion to dismiss. *Id.* at 698. It noted that, under § 922(a)(6), "the core of the offense is the making of a false statement about a prior conviction...." *Id.* at 697. Therefore, under § 922(a)(6), "a statement might well be deemed false even if subsequent to the making of the statement the prior conviction should be determined to be constitutionally invalid." *Id.*

The court looked for guidance to the Sixth Circuit's decision in *Cassity v. United States*, 521 F.2d 1320 (6th Cir.1975). In *Cassity*, the defendant answered "no" on a firearms application that asked if he had ever been convicted of a crime punishable by more than one year in prison, even though he had been so convicted. *Id.* at 1321. Cassity claimed that the

extrinsic fraud and Bland waited twenty-six months before checking the court records herself and another twenty months before moving to vacate).

conviction was void because it resulted from a plea tendered without counsel, in violation of the Sixth and Fourteenth Amendments. *Id.* The Sixth Circuit said, *id.* at 1323 (italics and boldface added):

> *[W]e are satisfied that § 922(a)(6) compels disclosure of all convictions which have not been set aside, whether ultimately shown to have been valid or not.* That section penalizes Cassity for making a false statement. It penalizes him not for being a convicted felon, but for failing to tell the truth about the conviction. *We think it apparent from the language employed that Congress intended to provide a scheme of regulation by compelling full and honest disclosure.* The section applies not merely to convicted felons, but to "any person" *and broadly forbids "any false or fictitious ... statement ... intended or likely to deceive ...* with respect to any fact material to the lawfulness of the sale ..." We are unable to believe that Congress intended that a prospective purchaser of a firearm under this section is entitled to conceal the fact of a prior conviction, even if a claim of constitutional invalidity is subsequently established. ***Nor can we believe that any person filling out the requisite form would conclude that he was not required to make disclosure under such circumstances.***

Of import here, the Sixth Circuit reasoned, *id.* (emphasis added):

> We conclude ... that the careful statutory scheme of gun control Congress has provided would be seriously jeopardized if a person convicted of a felony could, when purchasing a firearm, make the statement that he had never been convicted of such felony *based upon his own subjective belief* that his conviction was constitutionally defective *where such conviction had not prior thereto been set aside.* (Emphasis added.)

In *United States v. Vice,* 562 F.2d 1004 (5th Cir.1977), *cert. denied,* 435 U.S. 951, 98 S.Ct. 1578, 55 L.Ed.2d 801 (1978), when the defendant purchased a firearm, he "stated that he had never been convicted by any court of a crime punishable

by a prison term exceeding one year when in actuality he had been convicted of such a crime by a state court. . . ." *Id.* at 1005. He was later charged federally with "knowingly making a false statement in the acquisition of a firearm," in violation of 18 U.S.C. § 922(a)(6). Following his indictment, but prior to the trial of the federal offense, the state court that had convicted Vice "voided that conviction on constitutional grounds as of the date of the conviction." *Id.* Nevertheless, the defendant was convicted of the false statement charge in federal court. *Id.*

On appeal, the defendant argued that "the statement made while acquiring the firearm was not false since the original [state] conviction had been set aside and declared void as of a date prior to the firearm transaction and that therefore no violation of § 922(a)(6) had occurred." *Id.* The court rejected appellant's position, stating: "That the prior conviction was later set aside on constitutional grounds does not obviate the requirement imposed by § 922(a)(6) to tell the truth about the conviction." *Id.* (Citation and internal quotations omitted). Notably, the court also said: "At the time defendant made the statement and failed to reveal the existence of a prior conviction, the statement was false." *Id.*

*United States v. Liles,* 432 F.2d 18 (9th Cir.1970), is also noteworthy. There, the defendant was convicted of a felony in February 1969. *Id.* at 19. While his appeal was pending, he was released on his own recognizance. *Id.* In the Fall of 1969, Liles was charged with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 1202(a), for which he was convicted on February 26, 1970. *Id.* However, one day before he was convicted under § 1202(a), his February 1969 conviction was reversed; the § 1202(a) charge was based on that conviction. *Id.*

On appeal as to the § 1202(a) conviction, Liles argued that "Congress intended to punish possession of firearms only by those whose convictions were eventually sustained at the end of the appellate process." *Id.* at 20. Given that the underlying 1969 conviction was reversed, Liles argued that his

§ 1202(a) conviction could not stand. *Id.* The court rejected that argument. *Id.* Noting that "Congress' deep concern about the easy availability of firearms" led it to prohibit possession by "those who Congress had reason to believe pose a greater threat to community peace than does the public generally," *id.* (citation omitted), the court concluded that Congress had no intention to exempt from the statute "one whose status as a convicted felon changed after the date of possession, regardless of how that change of status occurred." *Id.*

The cases discussed above lead us to disagree with the dissent that appellant was placed in the "untenable position" of having to answer Question 8 in a way that conflicted with his personal belief that he had not been committed to a mental institution. In the context of this case appellant's personal belief was not controlling. When appellant signed the Application, it was a FACT that he had been expressly informed, by a judicial Order, that his admission to Potomac Ridge amounted to a commitment.

The dissent complains about the "perversity of the result in this case," in which we uphold the convictions, despite our reversal of the circuit court's finding of commitment in the companion appeal. Our reversal of the lower court's determination in the companion appeal is of no moment to our analysis of Furda's conduct at the time that he completed the Application. Rather, it is part of the orderly process of judicial review. Although our reversal is binding for now, it is not necessarily the last word as to the commitment issue. This is because our decision may be subject to further review by the Court of Appeals, and we cannot say if that Court will affirm our determination that appellant was not committed.[20] What we can say, unequivocally, is that, when Furda answered Question 8, under oath, the operative *fact* was the circuit court's ruling of November 7, 2007.

---

20. Of course, our decision in this appeal is also subject to further review.

We recognize that the Application did not ask appellant whether he had been found by a court to have been committed; it asked if he had been committed. Appellant maintains that he was not committed, and therefore his answer constituted a truthful response. But, the difference in the wording (were you found by a court to have been committed or were you committed) is a distinction without a difference under the circumstances attendant here. Appellant was obligated to answer "Yes" to Question 8 until such time as Judge Harrington's finding of commitment was set aside. It is difficult to "believe that any person filling out the [Application] would conclude that he was not required to make disclosure under such circumstances." *Cassity,* 521 F.2d at 1323. Therefore, Judge Rubin was entitled to conclude that Furda's answer was deliberately deceptive.

In our view, the "literal truth" defense does not apply here. To be sure, " '[a] literally true answer, even though unresponsive or "shrewdly calculated to evade," cannot form the predicate for a perjury conviction.' " *United States v. Bollin,* 264 F.3d 391, 411 (2001), *cert. denied, Gormley v. United States,* 535 U.S. 989, 122 S.Ct. 1544, 152 L.Ed.2d 469 (2002). *See Bronston v. United States,* 409 U.S. 352, 354, 362, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973); *United States v. Ahmed,* 472 F.3d 427, 432 (6th Cir.2006), *cert. denied,* 551 U.S. 1132, 127 S.Ct. 2987, 168 L.Ed.2d 705 (2007). But, a response does not come within the literal truth defense merely because the defendant " 'can postulate unstated premises of the question that would make his answer literally true.' " *Bollin,* 264 F.3d at 411 (citation omitted.)

*United States v. Endo,* 635 F.2d 321 (4th Cir.1980), provides guidance. There, the defendant was charged with making a false declaration during the process of plea bargaining, in violation of 18 U.S.C. § 1623. At a guilty plea proceeding, she had admitted, under oath, that she was guilty of mail fraud. Later, she sought to withdraw her plea, and stated, under oath, that she was not guilty. She was permitted to withdraw her plea and, at a later trial, was convicted. As a result of the

contradictory assertions of guilty and not guilty, the defendant was also prosecuted on the false statement charge. *Id.* at 322. The trial court convicted, based on the inconsistency of the defendant's statements. The Fourth Circuit reversed. *Id.*

Writing for the court, Judge Murnaghan said, *id.* at 323:

Appellant at the time she gave the inconsistent answers of "guilty" and "not guilty" had not been convicted. Guilt is a question of legal status; a defendant is not guilty until a judge or jury has so declared. After the jury determined her guilt, a factual aspect had been added. Thereafter, a "not guilty" answer would have been factually false, and so subject to prosecution. Prior thereto, however, it had not been decided whether or not she was guilty, so any answer, in contemplation of the law, had to be opinion, with no underlying factual component.[ ]

*Endo* suggests that, if appellant had not previously been found to have been committed by Judge Harrington, his answer of "No" to Question 8 would not support his convictions (assuming the evidence otherwise established that he believed his answer was the truth). But, once the court found as it did, appellant could not knowingly and wilfully represent to the contrary. At that point, "a factual aspect had been added," which Furda could not disregard. *Id.*

■ We also reject appellant's veiled suggestion that the Application was fatally ambiguous.[21] We explain.

---

21. In his initial brief, appellant did not argue that Question 8 was "fundamentally ambiguous." In its brief, however, the State addressed that issue. In reply, appellant conceded that he never claimed that Question 8 was ambiguous, but asserted that it "is a valid argument...."

The cases are legion that an appellate court generally will not address an argument that an appellant raises for the first time in a reply brief. *State v. Jones,* 138 Md.App. 178, 230, 771 A.2d 407 (2001), *aff'd,* 379 Md. 704, 843 A.2d 778 (2004). *See Federal Land Bank of Baltimore, Inc. v. Esham,* 43 Md.App. 446, 457, 406 A.2d 928 (1979) ("[I]t is necessary for the appellant to present and argue all points of appeal in his initial brief. As we have indicated in the past, our function is not to scour the record for error once a party notes an appeal and files a brief."); *Honeycutt v. Honeycutt,* 150 Md.App. 604, 618, 822 A.2d 551

P.S. § 5–133(b)(7) bars possession of a regulated firearm by individuals who have been confined for more than thirty consecutive days to a facility for the treatment of mental disorders. *See also* § 10–101(e) of the Health–General Article ("H.G."). Because appellant was only admitted for about four days, he claims that "the State's Attorney acknowledged that the Defendant had not been committed" under State law; " 'State law requires a hospitalization ... of 30–days or more....' " Therefore, Furda suggests that the Application was ambiguous as to whether Question 8 included federal law.

■ As a matter of law, a perjury or false statement conviction cannot be based on a response to a question that is "excessively vague, or fundamentally ambiguous." *United States v. Culliton*, 328 F.3d 1074, 1078 (9th Cir.2003) (citation and internal quotations omitted), *cert. denied*, 540 U.S. 1111, 124 S.Ct. 1087, 157 L.Ed.2d 900 (2004). *See* Tristan S. Breedlove, Article: Perjury, 46 Am.Crim. L.Rev. 899, 909 (2009) ("[C]ourts have consistently held that a fundamentally ambiguous question cannot be the basis of a perjury conviction."); *see also United States v. Heater*, 63 F.3d 311 (4th Cir.1995) (affirming a perjury conviction based on the defendant's false response to a question asking whether he had ever "bought or sold marijuana" because the question did not contain any fundamental ambiguity that would have prevented the jury from considering the question), *cert. denied*, 516 U.S. 1083, 116 S.Ct. 796, 133 L.Ed.2d 744 (1996).

■ "A question is fundamentally ambiguous when 'men of ordinary intelligence' cannot arrive at a mutual understanding of its meaning." *Culliton*, 328 F.3d at 1078 (citation omitted). *See United States v. Race*, 632 F.2d 1114, 1120 (4th Cir.1980) (in a case involving submission of false invoices under a federal contract, recognizing that a contract is ambig-

(explaining that when a party does not adequately brief an argument, we do not need to address it on appeal), *cert. denied*, 376 Md. 544, 831 A.2d 4 (2003).

In the exercise of our discretion, however, we shall address the issue, because we believe it is important to a complete analysis.

uous if it is "susceptible of at least two reasonable constructions," and stating that if "a defendant's statement or action under a contract accords with a reasonable construction of . . . the contract," the government did not meet its burden of proof); *United States v. King*, No. CR–08–002–E–BLW, slip op. at 22, 2009 WL 2848559 (D.Idaho Aug. 29, 2009) (concluding, in a perjury case, that the question in issue was not ambiguous because "people of ordinary intelligence could agree" on the meaning of the question). In deciding whether a question is "fundamentally ambiguous," the court may "consider the context of the question and [the defendant's] answers, as well as other extrinsic evidence relevant to [the defendant's] understanding of the questions posed in the Form." *Culliton*, 328 F.3d at 1078. However, "the existence of some ambiguity in a falsely answered question will not shield the respondent from a perjury or false statement prosecution." *Id.*

*United States v. Camper*, 384 F.3d 1073 (9th Cir.2004), *cert. denied*, 546 U.S. 827, 126 S.Ct. 38, 163 L.Ed.2d 75 (2005), is informative. Camper pleaded guilty to a state misdemeanor charge of "carrying a loaded firearm in public without being the registered owner. . . ." *Id.* at 1074. Thereafter, on a federal criminal history questionnaire for employment, Camper checked "no" to a question asking whether he had "been convicted of . . . '[u]nlawful possession . . . of an explosive or weapon.' " *Id.* (quoting questionnaire). He was subsequently indicted for making a false statement to the government, in violation of 18 U.S.C. § 1001(a)(2), which "prohibits giving false information in any matter within the jurisdiction of a department or agency of the United States." *Id.* at 1075. Camper moved to dismiss, alleging that his answer was "literally true because his conviction was for possessing a firearm in an unlawful manner, not for possession which was in itself unlawful." *Id.* at 1074. The court denied the motion. *Id.*

On appeal, Camper contended that "there was insufficient evidence that his answer was false." *Id.* The court observed: "A fundamentally ambiguous statement cannot, as a matter of law, support a perjury conviction." *Id.* at 1076. But, the

court also said, *id.:* "A statement is not fundamentally ambiguous simply because the questioner and respondent could possibly have had different interpretations." *Id.* Rather, the court reiterated: " 'A question is fundamentally ambiguous when men of ordinary intelligence cannot arrive at a mutual understanding of its meaning.' " *Id.* (citation omitted).

Further, the court stated: "The context of the question and other extrinsic evidence relevant to the defendant's understanding of the question may allow the finder of fact to conclude that the defendant understood the question as the government did and, so understanding, answered falsely." *Id.* The court added: "Ordinarily, the finder of fact decides which of the plausible interpretations of an ambiguous question the defendant apprehended and responded to." *Id.* (citation omitted). *See Culliton,* 328 F.3d at 1078.

The appellate court reasoned: "The only possible ambiguity in this case arises from a mismatch in terminology between the ... application (which is based on the requirements of federal law ...) and the California statute under which Camper was convicted...." 384 F.3d at 1076. According to the court, Camper had indeed been convicted previously of unlawful possession under California law, and his answer "was therefore false, at least according to one reasonable interpretation of the question." *Id.* at 1076–77. Although the court acknowledged that "another, more restrictive meaning of 'unlawful possession' " was possible, it found "nothing in the context to suggest that the questionnaire's terms were to be defined by reference to anything other than common usage." *Id.* at 1077.

The court concluded that "the questionnaire was not fundamentally ambiguous so as to preclude the possibility that questioner and answerer had the same meaning in mind." *Id.* at 1078. Although it recognized that there were "two plausible meanings" to the phrase "unlawful possession," it relied on "relevant extrinsic evidence as to which construction Camper placed on the question." *Id.* In particular, it considered that, when Camper pleaded guilty to the state offense, he had "used

the phrase 'unlawfully possessed' to refer to the offense [to which he pleaded guilty and] for which he was convicted." *Id.* The court determined that "a reasonable finder of fact could conclude ... that the questionnaire asked, and Camper answered, a question about convictions for possessing a gun in an unlawful manner. The evidence was sufficient to support the conviction." *Id.*

In *United States v. Boskic,* 545 F.3d 69 (1st Cir.2008), *cert. denied,* —— U.S. ——, 129 S.Ct. 1393, 173 L.Ed.2d 593 (2009), the court considered whether the defendant falsely answered questions on his immigration forms. Notably, the court said: "[R]esolving that issue requires us to consider [the defendant's] knowledge ... whether his answers were false depends on his understanding of the questions asked of him." *Id.* at 85.

*United States v. Good,* 326 F.3d 589 (4th Cir.2003), is also pertinent. In that case, the defendant applied for a Security Identification Display Area ("SIDA") badge at a Virginia airport, issued pursuant to Federal Aviation Administration ("FAA") regulations. *Id.* at 590. On the application, Good was asked: "Have you ever been convicted or found not guilty by reason of insanity of the following listed crimes ... 22. Burglary, Theft, Armed robbery, Possession or Distribution of Stolen Property ... 26. Dishonesty, Fraud, or Misrepresentation...." *Id.* The defendant answered "no" to both question 22 and question 26. *Id.* About a year before, however, she "had pleaded guilty to embezzlement," under Virginia law. *Id.* Accordingly, Good was charged with "knowingly and willfully making a fraudulent statement in violation of 18 U.S.C. § 1001(a)(2)." Good sought to dismiss the indictment, arguing, *inter alia,* "that her statements were literally true because embezzlement was not a crime listed on the application...." *Id.* The Fourth Circuit affirmed the dismissal of the indictment because the "defendant's statement was literally true...." *Id.* at 591.

The court rejected the government's argument that the defendant's statements were false because embezzlement fell

"within the purview of disqualifying crimes of theft, fraud, dishonesty, and misrepresentation." *Id.* (internal quotations omitted). It acknowledged that "embezzlement is a felony *involving* dishonesty, fraud, and misrepresentation," *id.* at 592, and recognized that the defendant had pleaded guilty to the crime of embezzlement. But, the court also said: "Embezzlement ... was not one of the crimes listed on the application." *Id.* at 591–92. The court reasoned: "Given the wording of the question and the crime for which the defendant was convicted, her answers on the application were thus literally true; the defendant has never been convicted of any of the crimes listed on the application." *Id.* at 592.

Here, Question 8 was quite broad. It lacked the degree of specificity on which the court relied in *Good. Cf. Bronston v. United States,* 409 U.S. 352, 362, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973) (in the context of interrogation, stating that "[p]recise questioning is imperative as a predicate for the offense of perjury," and that "a jury could not be allowed to consider a perjury charge where the allegedly false statement was 'literally true but not responsive to the question....' "); *United States v. Bonds,* 580 F.Supp.2d 925, 931 (N.D.Cal.2008) (finding that "the indefinite time period did not make the question fundamentally ambiguous" and stating: "If defendant's responses were false as he understood the questions, [any potential] conviction is not invalidated by the fact that his answer to the questions might generate a number of different interpretations") (internal citations and quotations omitted).

As we indicated, P.S. § 5–133(b)(7) prohibits possession of a regulated firearm by individuals who have been confined in a mental institution for more than thirty consecutive days. In contrast to Question 8, Question 7 of the Application was far more specific. It asked: "Have you ever spent more than 30 consecutive days in any medical institution for treatment of a mental disorder or disorders?" That question was clearly based on State law (P.S. § 5–133(b)(7)), and appellant could truthfully answer "No" to Question 7, because his admission was only for a few days. But, the *very next* question on the Application asked about "commitment," generally, without any

time limitation. There was no suggestion in the Application that Question 8 contemplated any specific duration of hospitalization, or that it was limited to State law. Rather, the question was broadly phrased.

Moreover, the term "commitment" was not used in the Application in a technical sense. Because it was not defined, its common meaning would apply, particularly to a lay person. The common meaning of "commitment" refers to "consignment to a penal or mental institution." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 250 (11th ed. 2004). *See United States v. Midgett*, 198 F.3d 143, 147 (1999) (because Congress did not define the term "committed," the court reads it in light of the common usage.... In its broadest sense, to "commit" means "to place officially in confinement or custody."), *cert. denied*, 529 U.S. 1028, 120 S.Ct. 1440, 146 L.Ed.2d 328 (2000).

In addition, we reiterate that, at the bottom of the Application, appellant signed his name, certifying "under the penalty of perjury that the above answers are true and correct and that *I am not prohibited by law from purchasing or possessing a regulated firearm.*" (Emphasis added.) Yet, he knew that the court had ruled that he was prohibited by federal law from possessing a regulated firearm.

When we apply the rationale of the cases cited above, we are satisfied that the question, "Have you ever been ... committed to a mental institution," was not "fundamentally ambiguous." To be sure, the question was posed on a Maryland State Police form, for the purpose of determining an applicant's eligibility to purchase a firearm in Maryland. *See Dep't of Pub. Safety & Corr. Services v. Berg*, 342 Md. 126, 138–39, 674 A.2d 513 (1996) (concluding that Maryland State Police could enforce federal law prohibiting firearm possession based on narcotics conviction, and therefore police could disapprove a firearm application submitted by a person prohibited under federal law). But, the Application did not specify that the applicant was to respond only under State law.

In addition, the court below was entitled to consider the "context" and "extrinsic evidence relevant to the defendant's

understanding of the question...." *Camper*, 384 F.3d at 1076. The context and extrinsic evidence unequivocally established Furda's knowledge that Judge Harrington had determined that he was prohibited under federal law from possessing regulated firearms because he had been committed to a mental institution. Armed with the knowledge of that ruling, Furda nonetheless proceeded to apply for the purchase of a gun and deliberately answered a question about commitment in a way that was directly contrary to the court's ruling and was intended to deceive.

## III.

 Appellant contends that the court "improperly shifted the Burden of Proof" to appellant and "improperly usurped the prosecutorial function...." We pause to review additional facts.

At the close of Booth's testimony, the court questioned him as follows: [22]

[THE COURT]: But, approaching this perhaps from a different point of view, I take it you never told your client that he could make a false statement in an application, did you?

[BOOTH]: No.

[THE COURT]: So, putting aside for a moment whether your client agreed or disagreed with the decision of Judge Harrington, is it fair to say that if he was going to fill out an application, he would still have to answer it truthfully, even if he disagreed with what Judge Harrington said?

[BOOTH]: Yes.

[THE COURT]: So one way to have truthfully filled out the application was that, when you got to question 8, you could instead of saying "yes" or "no," you could say, "see footnote." The footnote says, "This is what Judge Harrington said. I think she's wrong. In fact, I've appealed her all the

---

**22.** Although we previously quoted some of this testimony, we repeat it for the convenience of the reader.

way to the Supreme Court of Mars. But here are the facts. So I'm not making a false statement and I'm not misleading anybody," correct?

[BOOTH]: Correct.

[THE COURT]: But to have omitted the information that your client had in answering question 8 by omitting that, isn't the answer to question 8, as drafted, misleading?

[BOOTH]: Actually, Your Honor, I'm not 100 percent convers[ant] with question 8[.]

[THE COURT]: Not following me? Okay. Question 8 says, which is I think the guts of this case.

[PROSECUTOR]: It is indeed. The second phrase, Your Honor.

[THE COURT]: It says, "Have you ever been adjudicated mentally defective or have you been committed to a mental institution?" It's a question. A person has the following choices: they can say "yes," they can say "no". Or they can do some combination of yes and no, but they can add explanatory material so as not to make their yes or their no materially misleading. So he could have said, "No, footnote, but see Judge Harrington's order, you know, 42 pages of explanatory material" and we wouldn't be here probably because it wouldn't have been misleading. Or he could have said, "Yes, but see she's wrong. I'm going to get it straightened out. And after you look at all the, you, State Police, look at all the facts you'll agree with me that I should have my gun."

That was certainly an option open to Mr. Furda or somebody in Mr. Furda's position. Would it not have been to make such a disclosure like we use [sic] to do, I think they still do on documents submitted to the federal government when yes or no is not really the right answer? It's yes, comma, or no, comma. Or you don't answer yes or no. You just make your statement and the statement's true. Have a nice day.

What's the rocket science behind all this?

[BOOTH]: Your Honor, is there a question?

[THE COURT]: No, not really.

[BOOTH]: I can tell you I'm not conversant enough with that form to even know that there's a footnote section.

[THE COURT]: Even if there's not, you take a separate piece of paper, you write out whatever it is you think they need to know and you attach it. It just seems to me folks have been doing that for the last 70 years in responding to recent federal forms.

During defense counsel's closing argument, the following ensued:

[BOOTH]: As Your Honor heard the testimony from Mr. Furda and I think the bottom line is he was firmly convinced that he was eligible to purchase a firearm. I mean, he stated that today. I mean, to this day he is convinced.

THE COURT: May I ask you a question?

MR. BOOTH: Certainly, Your Honor.

THE COURT: Does his belief—does it not need to be objectively reasonable? . . . Because, as the Supreme Court said in *Cheek*,[23] in adopting the good faith belief, but objectively reasonable standard, because the tax laws were so complicated. Does it not have to be objectively reasonable or, no offense, but will any delusion do?

MR. BOOTH: No, Your Honor, and it's not delusional and I think it is objectively—

THE COURT: "Delusion" in quotes. I'm not being critical. But, I mean, the Supreme Court has been clear in these cases that the confusion or mistake or whatever it is has to

---

**23.** *See Cheek v. United States,* 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991). Cheek was convicted of "willfully" attempting to evade income taxes. He agreed that he had not paid his income taxes, but claimed that he believed that the wages were not taxable income. The Supreme Court said, *id.* at 203, 111 S.Ct. 604:

It was . . . error to instruct the jury to disregard evidence of Cheek's understanding that, within the meaning of the tax laws, he was not a person required to file a return or to pay income taxes and that wages are not taxable income, as incredible as such misunderstandings of and beliefs about the law might be.

be objectively reasonable doesn't it? Or am I wrong? If I'm wrong, straighten me out. This is your chance.

MR. BOOTH: Even accepting that, Your Honor, even if it is objectively reasonable, I would argue that in Mr. Furda's case it is reasonable. He is the actual person who was evaluated. He was a subject—

THE COURT: So you're saying it doesn't have to be objectively reasonable?

MR. BOOTH: No, I'm saying I think it is in this [case] objectively reasonable.

THE COURT: Okay.

MR. BOOTH: He certainly has reason enough to believe that Judge Harrington's order was wrong, in terms of whether he was ever committed or not.

THE COURT: So you're saying that a good faith, albeit objectively unreasonable. But if I find that he subjectively believed that would acquit him?

MR. BOOTH: Certainly on the perjury charge, Your Honor.

THE COURT: Okay.

MR. BOOTH: I mean, he was absolutely forthright here, Your Honor. I mean, he's certainly convinced that in this particular case that Judge Harrington, with all due respect to Judge Harrington, it was just that it's not a correct decision. And I think Your Honor raised the issue about the footnote. But as Mr. Furda testified, he didn't know about the footnote. But what did he do? He brought the motion for reconsideration that I had drafted to the gun shop. And by his testimony, as well as Mr. Flynn's—

THE COURT: Well, let me get back to my unduly simple example. You represent Smith. Smith is tried for robbery. The evidence is scampy [sic] but the jury convicts Smith. Verdict, judgment of conviction entered, you take an appeal, sufficiency of the evidence.

Before the Appellant [sic] Court hears your case and you win, by the way, Smith goes out and applies for a security clearance at Lockheed Martin and—knowing it's going to be

submitted to the DOD. So that gives the under perjury to the Federal Government and these things. Have you ever been convicted of a felony? Smith says, no, believing he's innocent and will prove it one day. Life is good. The jury got it wrong. The judge got it wrong. The Court of Appeals will straighten them out.

Later, the Court of—after the submission of the application—later the Court of Appeals says evidence is insufficient as a matter of law. We apologize. We're really sorry. And here's a million dollars for your troubles. Smith later gets charged with perjury under federal law for making a knowing false statement on an application to the Defense Department.

Good or not good?

MR. BOOTH: I think it's been mooted out.

THE COURT: Really?

MR. BOOTH: By the Appellant [sic] Court. There's a contrast here also, though.

THE COURT: The statement was knowingly false with me. The jury said guilty. The jury is wrong. Judge Harrington said, arguably, guilty. You say Judge Harrington's wrong. That's fine. But isn't that analogous?

MR. BOOTH: It is analogous and it's not. And the reason is, is, in your particular situation, in the Smith case he's had a trial. Presumably there's been testimony. Presumably there's been evidence, it's been in front of a jury or a judge hearing all of the evidence.

Judge Harrington's ruling was made as a result of a motion hearing, 15 minutes per side. And that's it. And there was no testimony. No one took the stand at that hearing.

THE COURT: Well, let me go down the road that you've decided to travel.

Are you saying that, given the procedure [sic] posture as you've outlined it, your client, if he had been in disagreement with Judge Harrington's ruling, would have been free to disobey the order? Because you know a quick 10-minute

motions hearing, boom, boom, no trial, no witnesses, gone. Judge issues order. Can you ignore it?

MR. BOOTH: No.

THE COURT: Well, what's the difference? You can't ignore the order, why doesn't it count?

MR. BOOTH: Well, Your Honor, because, again, it's not the full panoply of rights that you had stated in your first hypothetical. It's a civil order. And it's issued as part of a motion to return property. So does it have to be obeyed? Yes. What's the penalty? Contempt. Violation of a Court order.... And in this particular case Mr. Furda's charged with perjury.

We turn to the parties' contentions.

In appellant's view, the court "improperly shifted the Burden of Proof" to appellant, because it "repeatedly emphasized the fact that Mr. Furda never attached any explanation, regarding his evaluation period at Potomac Ridge, to the firearm application," thereby asking him "to prove that [he] could not amend or explain [his] answers." Appellant complains that the court "blamed" him, "in essence, for 'not doing something.'"

According to Furda, "the burden should have been on the Government to show that attachments were allowed on the firearm application form, or [that] there was a comment section on the form that Mr. Furda failed to utilize." He alleges prejudice from the court's "Constitutional error" of "requir[ing] the Defendant to demonstrate that he was not allowed to explain his answers (via a comment section or attachments)."

Appellant also complains that the court "repeatedly faulted" him for failing to subpoena Mr. Gilbert, the gun shop owner, to testify that the Application did not contain a comment section and that no attachments were allowed. According to appellant, "[t]he judge thus imposed upon the Defense, the burden of persuasion, the burden of proof and the burden of going forward by requiring the Defense to produce a witness."

In addition, appellant points out that the Application did not contain a " 'comment' section . . . nor is there any part of the form that tells an applicant he can attach documents to provide an explanation." He notes that he "specifically testified that he had brought the Motion for Reconsideration with him to the gun shop, . . . that he spoke to Mr. Gilbert, at length, prior to filling out the form, . . . and that he also had been told that attaching a document to the form was not allowed." [24] He adds that Gilbert's affidavit, which appellant attached to his Supplement to Motion for New Trial, "corroborates the same information[.]"

Appellant also contends that the court "improperly usurped the prosecutorial function" by "argu[ing] the Government's position" with regard to "several matters." [25] And, he challenges the court's interjections in defense counsel's closing argument, during which the court "debated at length with Defense Counsel about his arguments." Further, he complains that the court "continued the role of advocate" at the hearing on appellant's Motion for New Trial. Thus, Furda insists that the court denied him "the fair trial that is his Due Process right under the U.S. Constitution."

The State counters that "Furda received a fair trial, in accordance with the Constitution's Due Process requirements." It maintains that "[t]he trial court properly required

---

**24.** Appellant did not testify that he was told that he was not allowed to attach any documents to the Application. As noted, after the court rendered its verdict, defense counsel told the court that appellant would like to testify to that effect.

**25.** Appellant does not identify the matters, but cites to pages in the transcript in which the court addressed appellant's request that it take judicial notice of the Potomac Ridge records. As we recognized in *Rollins v. Capital Plaza Assocs., L.P.,* 181 Md.App. 188, 201, 955 A.2d 869, *cert. denied,* 406 Md. 746, 962 A.2d 372 (2008), courts (" 'cannot be expected to delve through the record to unearth factual support favorable to [the] appellant.' ") (citation omitted). *See also Griner v. State,* 168 Md.App. 714, 740, 899 A.2d 189 (2006) ("[O]ur function is not to scour the record for error once a party notes an appeal and files a brief.") (citation and quotation marks omitted).

the prosecution to shoulder the burden of proof at trial" and "conducted the trial in an impartial manner."

Moreover, the State argues that the court engaged in typical exchanges with counsel, in which it "articulate[d] its understanding of the law, pose[d] hypotheticals, and forth-rightly point[ed] out what may be weaknesses in [appellant's] case." But, in its view, the court did not do anything that "would cause a reasonable person to question [its] partiality." In any event, the State argues that appellant's allegation of partiality "is not preserved," because "Furda never lodged an objection to what he now claims is improper conduct."

Appellant responds that "the Defense did object by arguing, at length, and repeatedly, with the Trial Judge over his comments and his remarks." Moreover, appellant asserts that "because the Trial Judge was not asking a question, an objection would have been inappropriate, particularly in a bench trial."

We agree with the State that the issues of bias and lack of partiality are waived. Notably, the judge asked if he could pose a question to appellant, and defense counsel said "let's hear the question." Thereafter, defense counsel never object-ed to the question that was posed. The judge also asked if he could question defense counsel during closing argument, and defense counsel consented. As the Court has said, "ordinarily the failure to object will only be countenanced in those in-stances in which the judge exhibits repeated and egregious behavior of partiality, reflective of bias. Failure to object in less pervasive situations may not have the same result, nor will we necessarily intervene." *Diggs v. State*, 409 Md. 260, 294, 973 A.2d 796 (2009). *See also* Md. Rule 8–131.

Even if preserved, the contention lacks merit. We explain.

 Certainly, " 'an impartial and disinterested judge' " is " 'fundamental to a defendant's right to a fair trial. . . .' " *Diggs*, 409 Md. at 287, 973 A.2d 796 (citations omitted). Therefore, " '[i]f a judge's comments during [the proceedings] could cause a reasonable person to question the impartiality of the judge, then the defendant has been de-

prived of due process and the judge has abused his or her discretion.'" *Id.* at 289, 973 A.2d 796 (quoting *Archer v. State*, 383 Md. 329, 357, 859 A.2d 210 (2004) (other citations and quotation marks omitted)). But, there is no blanket rule prohibiting a trial court from questioning witnesses or counsel, particularly at a bench trial. Even in the context of a jury trial, this Court recently stated that it is "well-settled" that a judge has discretion to question witnesses, noting that the "principal justification" for such questioning is "to clarify issues in the case." *Smith v. State*, 182 Md.App. 444, 480, 957 A.2d 1139 (2008). Nevertheless, trial judges must exercise this discretion sparingly, "lest they compromise their roles as impartial arbitrators in the eyes of the jury." *Id.* at 482, 957 A.2d 1139.

In *Smith*, 182 Md.App. at 489, 957 A.2d 1139, this Court noted that there is a "'fine line between assisting the jury by bringing out facts and "sharpening the issues," which is permissible, and influencing the jury's assessment of facts or of a witness's credibility by indicating his own opinions, which is not permissible.'" (Quoting *Leak v. State*, 84 Md.App. 353, 363–64, 579 A.2d 788 (1990)). The number of questions asked is not dispositive of the issue. Rather, it is "the degree to which these questions risked influencing the jury" regarding "what appeared to be the trial court's 'point of view' with respect to the facts of the case." *Id. See also Vandegrift v. State*, 237 Md. 305, 311, 206 A.2d 250 (1965) ("The questioning by the trial judge showing his disbelief of the witness'[s] testimony was beyond the line of impartiality over which a judge must not step."). In this case, of course, there was no jury, which weakens appellant's claim.

*Diggs, supra*, 409 Md. at 260, 973 A.2d 796, also provides guidance. There, the Court of Appeals reversed the convictions of two defendants based on the trial judge's extensive questioning at a jury trial. *Id.* at 295, 973 A.2d 796. The judge "elicited key elements of the State's case," including "laying the foundation" for one of the charges and "establish[ing] the chain of custody of the drugs after the prosecutor

failed to do so." *Id.* at 293, 973 A.2d 796. The judge also extensively questioned a defense witness in a way that conveyed the judge's disbelief of the testimony, including asking the witness if she was "comfortable with" her testimony. *Id.* at 266–67, 973 A.2d 796. The Court of Appeals determined that the trial judge "acted as a co-prosecutor" by questioning the witness in a manner that implied a disbelief in the defense, and this partiality and bias denied the defendants their right to a fair and impartial trial. *Id.* at 293–95, 973 A.2d 796. The Court said: " 'A fair jury in jury cases and an impartial judge in all cases are prime prerequisites of due process. It is a maxim that every litigant, including the State in criminal cases, is entitled to nothing less than the cold neutrality of an impartial judge. . . .' " *Id.* at 288, 973 A.2d 796 (quoting *Archer*, 383 Md. at 356, 859 A.2d 210 (citation and quotation marks omitted)). *See also Jefferson–El v. State*, 330 Md. 99, 106, 622 A.2d 737 (1993) (stating that judges' "conduct during a trial has a direct bearing on whether a defendant will receive a fair trial because their opinion or manifestations thereof usually will significantly impact the jury's verdict").

In this case, the judge was the fact finder. There was no jury that could have inferred bias from the judge's discourse with the witnesses and counsel, nor danger that the judge's conduct would " 'impact the jury's verdict' " or impinge on the jury's " 'province . . . to decide the guilt or innocence of the defendant.' " *Diggs*, 409 Md. at 289, 973 A.2d 796 (citation omitted). Moreover, there was nothing whatsoever about the court's questions or the colloquy with counsel suggesting bias or partiality. To the contrary, the judge, who was tasked with ascertaining the facts and construing the law, was fully engaged in an attempt to understand the testimony and appellant's position. The colloquy displayed the careful, reflective consideration that the trial process is intended to achieve.

In sum, the transcript reveals a judge who was immersed in a thorough analysis of the issues raised by the parties. His thoughtful questions and his colloquies with counsel demonstrate that he was attempting to understand and resolve the

thorny issues presented by this case that he, as the fact finder, had to resolve.

The remaining contentions also lack merit. We explain.

 It is well settled that, " 'under the Federal Constitution, as well as the law of Maryland, the burden is on the State to prove all elements of the alleged crime and to do so beyond a reasonable doubt[.]' " *Bennett v. State,* 283 Md. 619, 625, 392 A.2d 76 (1978) (citation omitted). As the Court said in *Montgomery v. State,* 292 Md. 84, 91, 437 A.2d 654 (1981): "There are certain bedrock characteristics which distinguish our system from most others throughout the world and which are indispensable to the integrity of every criminal trial . . ., [one of which is that] [t]he State has the burden to produce evidence of each element of the crime establishing the defendant's guilt." Thus, it is unconstitutional to " 'impose[ ] upon a defendant a burden of proving, by any standard, his innocence as to any element of a crime. . . .' " *Bennett,* 283 Md. at 624, 392 A.2d 76 (citation omitted).

Appellant argues that it was the duty of the prosecution "to produce a witness to testify that comments could be added and explanations could be attached to the form, but the Trial Court held it against the Defense for not providing a witness to say 'comments cannot be made on and items cannot be attached to the form.' " Pointing to *Melendez–Diaz v. Massachusetts,* —— U.S. ——, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), appellant avers that "[t]he Supreme Court is very clear that this simply is not the correct allocation of the burdens; simply because the Defense has the ability to subpoena witnesses does not require them to put on the Government's case."

It was readily apparent that the Application did not have a comments section. As the State aptly points out, "[t]he judge's observations that Furda could have attached explanatory material . . . did not shift the burden of proof." Rather, the court "was simply commenting on the evidence that was in the record, and the inferences that could be drawn from it,"

but "these comments do not show that the judge shifted the burden of proof."

Appellant's reliance on *Melendez–Diaz* is also misplaced. In that case, the trial court admitted into evidence affidavits that "report[ed] the results of forensic analysis which showed that material seized by the police and connected to the defendant was cocaine." 129 S.Ct. at 2530. On appeal, the defendant argued that the affidavits of the analysts were testimonial, and thus were subject to the defense's Sixth Amendment right of confrontation. *Id.* Because the analysts were not called as witnesses by the prosecution, the defendant insisted that the admission of the affidavits violated the Confrontation Clause. *Id.* at 2531. The Commonwealth countered that there was no Confrontation Clause violation because the defendant could have subpoenaed the analysts. *Id.* at 2540. The Court rejected that argument, noting that the subpoena power "is no substitute for the right of confrontation. Unlike the Confrontation Clause, those provisions are of no use to the defendant when the witness is unavailable or simply refuses to appear." *Id.*

Here, in contrast to *Melendez–Diaz*, the State made no attempt to introduce affidavits in lieu of witnesses. Moreover, the trial court did not put the onus on appellant to present the gun shop owner as a witness.

In addition, the State met its burden of proof by offering the Application, which stated that a "physician's certificate" could be attached to it, thereby providing sufficient evidence from which the trier of fact could infer that other documents or explanations could have been attached. Furda was not convicted of committing perjury or making a false statement because he did not provide an explanation; rather, he was convicted under C.L. § 9–101 and P.S. § 5–139(a) for knowingly, willingly, and falsely answering "No" to Question 8.

## IV.

Appellant complains that the court "improperly denied a defense request to take Judicial Notice of records which

were already part of the case-file." He insists that the Potomac Ridge records "were critical . . . because they clearly showed that Mr. Furda was only 'evaluated' [and] that he never was 'admitted' nor 'committed,'; and, that no hearing was ever held. . . ."

The State counters: "The trial court properly exercised its discretion not to consider Furda's medical records," because "Furda did not make arrangements for the records, or copies of the records, to be available on the day of trial." It notes that the medical records "had been subpoenaed and placed under seal" in the Protective Order Case, and "Furda had received a copy of these records in open court during the hearing on his petition to recover firearms." The State also argues that any error was harmless, because "Furda's testimony about his hospitalization . . . which the judge appeared to credit, was substantially consistent with the medical records."

Maryland Rule 5–201 is captioned "Judicial notice of adjudicative facts." Md. Rule 5–201(d) states: "A court shall take judicial notice if requested by a party and supplied with the necessary information."

In *Lerner v. Lerner Corp.*, 132 Md.App. 32, 750 A.2d 709, *cert. denied*, 360 Md. 275, 757 A.2d 810 (2000), Lerner filed a motion asking this Court to "take judicial notice of Lerner Corporation's offer to sell stock" and an "order" and "notice of judgment" entered by the circuit court in a prior proceeding among the parties, so that "this Court [would have] a full chronology of the dispute among the parties." *Id.* at 40, 750 A.2d 709. The Court granted the motion as to the order and notice of judgment, but refused to take judicial notice of the offer to sell stock because it was "not a part of the record, and its accuracy is subject to reasonable dispute and cannot be as readily and accurately ascertained." *Id.* at 41, 750 A.2d 709. We explained, *id.* at 40–41, 750 A.2d 709:

> The doctrine of judicial notice substitutes for formal proof of a fact "when formal proof is clearly unnecessary to enhance the accuracy of the fact-finding process." *Smith v.*

*Hearst Corp.,* 48 Md.App. 135, 136, 426 A.2d 1 (1981). A court may judicially note facts that readily can be determined by examination of a source whose accuracy cannot be reasonably questioned. Md. Rule 5–201(b). Included among the categories of things of which judicial notice may be taken are "facts relating to the . . . records of the court." *Smith,* 48 Md.App. at 136 n. 1, 426 A.2d 1. In McCormick's treatise on evidence, it is said to be "settled, of course, that the courts, trial and appellate, take notice of their own respective records in the present litigation, both as to the matters occurring in the immediate trial, and in previous trials or hearings." *McCormick on Evidence* § 330, at 766 (2d ed. 1972), *quoted with approval* in *Irby v. State,* 66 Md.App. 580, 586, 505 A.2d 552 (1986), *cert. denied,* 308 Md. 270, 518 A.2d 732 (1987).

Appellant did not offer the records. The judge's decision not to take judicial notice of the medical records does not establish that the court would have barred their admission in evidence, had appellant offered them. Even assuming, *arguendo,* that the Potomac Ridge records were the proper subject of judicial notice, they were not pertinent to the disposition of the Perjury Case. This is because the court was not assessing the merits of Judge Harrington's Order; that is the subject of a separate appeal.

## V.

 Appellant contends that the court committed "reversible error" when it denied his Motion for New Trial under Md. Rule 4–331.[26] We pause to review additional facts.

---

26. **Rule 4–331. Motions for new trial.**

(a) **Within ten days of verdict.** On motion of the defendant filed within ten days after a verdict, the court, in the interest of justice, may order a new trial.

Appellant filed a Motion for New Trial on September 2, 2008, pursuant to Md. Rule 4–331(a). He complained that the State "did not produce any independent evidence other than the Court Order to demonstrate that Mr. Furda had been committed under the Federal, State, and County definitions of 'commitment.'" Further, he argued that the court could not rely on the Order of November 7, 2007, as it was "the result of a civil motion hearing," for which there was "the total absence of live testimony, no ability to cross examine, and a lower standard of proof. . . ."

Furda also insisted that the emergency evaluation was not a commitment. In addition, he contended that State law preempted Montgomery County Code § 57–9(d) (2004), pertaining to the regulation of firearms, and thus the court erred in convicting him under County law. Further, appellant maintained that, at the time he applied to purchase a firearm, he and his counsel were unaware that his motion for reconsideration had been denied.

Appellant attached the Potomac Ridge records to his Motion for New Trial. The documents included a Notice of Hearing, which stated that appellant's "involuntary admission [was] being sought because [he] present[ed] a danger to the life or safety of the individual or of others." In addition, appellant attached the "Continuing Care/Discharge Planning form, which indicated that appellant was admitted on February 28, 2003, and released on March 4, 2003. It provided: "SPECIAL INSTRUCTIONS: No Access to substances or fire-

---

(b) **Revisory power.** The court has revisory power and control over the judgment to set aside an unjust or improper verdict and grant a new trial:

$$*\qquad*\qquad*$$

(2) in the circuit courts, on motion filed within 90 days after its imposition of sentence. . . .

(c) **Newly discovered evidence.** The court may grant a new trial or other appropriate relief on the ground of newly discovered evidence which could not have been discovered by due diligence in time to move for a new trial pursuant to section (a) of this Rule:

(1) on motion filed within one year after the date the court imposed sentence or the date it received a mandate issued by the Court of Appeals or the Court of Special Appeals, whichever is later. . . .

arms." Furda also attached a Discharge Summary, signed by attending physician Joseph Marnell, M.D. on March 13, 2003, which indicated that appellant was discharged on March 4, 2003, with diagnoses of "Psychosis, NOS [i.e., not otherwise specified], probably drug-induced," and "Amphetamine Dependency." It also provided that appellant was "evaluated and involuntarily committed" at Potomac Ridge. Dr. Marnell elaborated:

> The patient refused to sign in on a voluntary basis. I was confronted with the dilemma of whether to try to pursue an involuntary commitment against him as the hearing was to occur on the day of discharge.... I have no grounds for detaining the patient at this time. There is no evidence of psychosis, confusion or withdrawal.... I emphasize the patient is completely responsible for his actions.

The State opposed appellant's motion, contending that, for purposes of purchasing firearms, appellant was a "prohibited person" under federal law. According to the State, the records appellant attached were the same records that the trial court declined to judicially notice. Moreover, the State argued that the records were not the proper subject of Md. Rule 4–331(c), because appellant had possession of copies and could have offered them at trial.

On October 14, 2008, appellant filed a Supplement to Motion for New Trial, noting that his Motion for New Trial was filed pursuant to Md. Rule 4–331(a), and stating that if the Supplement did not fall within the deadline of Md. Rule 4–331(a), it should be considered as a motion pursuant to Md. Rule 4–331(b). Furda pointed to his testimony that "he attempted to attach the Motion for Reconsideration to his application," but he was unable to attach documents "to this application to explain his situation," because the gun shop owner, Gilbert, said that attaching documents "is simply not done." Appellant attached to the Supplement an affidavit from Gilbert to the same effect.

At a motion hearing on October 14, 2008, defense counsel argued that, "in the interest of justice," the court had "enough

leeway" under Md. Rule 4–331(a) to consider the additional evidence. Nevertheless, he said: "I'll have to concede that this evidence did exist at the time, because it had been brought out in the underlying case. And it did not come into evidence in the case that is distinctly before Your Honor."

The court indicated that, under Md. Rule 4–331(a), a trial court could not consider new evidence. It observed that defense counsel asked "very generally" for the court "to sort of take judicial notice of court records"; the documents were not "marked and tendered into evidence...." Nonetheless, the court considered the documents, observing that the attending physician who discharged appellant from Potomac Ridge said that Furda's "final diagnosis" was "psychosis" and "his final medication [was] Ziprexa." Moreover, the discharge papers indicated "no guns...."

Further, the court considered that "Congress ... did not provide a definition" for "commitment to a mental institution," but noted that "regulations in 27 C.F.R." provide that "the term does not include a person in a mental institution for observation or a voluntary admission to a mental institution." The court determined that Potomac Ridge's "only authority to keep [Furda] against his will is [H.G. §] 10–625[ (a) ][27]. So at least implicitly that's what they did." The court observed, however, that the word "commitment" does not appear in H.G. § 10–625. It reasoned that the word is "too harsh," and the Legislature used " 'admission' because ... it feels better. It's the same damn thing, to be blunt." The court concluded: "It's an emergency involuntary commitment."

The court also determined that Gilbert's affidavit did not constitute "newly discovered evidence[.]" Defense counsel conceded that he did not subpoena Mr. Gilbert, and the court

---

27. **§ 10–625. Emergency involuntary admission**

(a) *Placement.*—If an emergency evaluee meets the requirements for an involuntary admission and is unable or unwilling to agree to a voluntary admission under this subtitle, the examining physician shall take the steps needed for involuntary admission of the emergency evaluee to an appropriate facility, which may be a general hospital with a licensed inpatient psychiatric unit.

noted that "Mr. Gilbert was not either at trial or here today for cross-examination by the State."

In denying the motion, the court said: "[T]he documents in issue do not qualify as newly discovered evidence.... Here, every single thing I've been shown existed at the time of trial. So this case does not get the benefit of that exception to the rule." Further, the court ruled:

> One simply cannot knowingly, voluntarily, and intentionally disregard the order of a Circuit court judge and the clear import of that order, when signing a document under the penalties of perjury, when what you say in the document is flatly opposite of what the Judge said—you can do it, but not with impunity.

On appeal, appellant insists that the court abused its discretion by refusing to grant a new trial to consider the Potomac Ridge Records and Gilbert's affidavit. He posits that, "when dealing with a criminal case, 'a Trial Judge's discretion to deny a Motion for New Trial is much more limited than under other circumstances.'" In his view, "a Trial Judge 'has virtually no discretion to refuse to consider newly discovered evidence that bears directly on the question of whether a new trial should be granted'" or that "'clearly indicates that the jury has been mislead [sic].'" (Citations omitted.)

The State observes that this Court generally reviews such denials only "'under the most extraordinary or compelling of circumstances.'" In the State's view, the circumstances here are "remarkable only because they could so easily have been avoided." (Citation omitted.) In particular, the State points out that "Furda conceded that the medical evidence [was] not newly discovered" and that "Gilbert had not been subpoenaed."

■ It is well settled that a trial court's denial of a motion for new trial is generally subject to review for abuse of discretion. *See, e.g., Campbell v. State,* 373 Md. 637, 665, 821 A.2d 1 (2003). In some instances, however, an appellate court reviews for error the denial of a motion for a new trial. *See Merritt v. State,* 367 Md. 17, 30–31, 785 A.2d 756 (2001). In

our view, the circuit court did not err or abuse its discretion in denying appellant's new trial motion Trial. The Potomac Ridge records and Gilbert's affidavit did not constitute "newly discovered evidence" because Furda knew of Gilbert and the Potomac Ridge records at the time of trial. *See* Md. Rule 4–331(c); *Ramirez v. State,* 178 Md.App. 257, 282, 941 A.2d 1141 (2008), *cert. denied,* 410 Md. 561, 979 A.2d 708 (2009).[28] The Motion for New Trial is not a vehicle to obtain the proverbial "second bite at the apple."

**JUDGMENT AFFIRMED. APPELLANT TO PAY COSTS.**

Dissenting Opinion by MEREDITH, J.

MEREDITH, J., dissenting.

Is an affiant obligated to respond to a question on a form by providing an answer the affiant believes is factually false in order to avoid committing the crime of perjury? The result in this case places a person in the untenable position of having to state under oath that something is true—namely, in this case, that Furda had in fact "been committed to a mental institution"—even though the person does not believe the truth of that statement, in order to avoid committing the crime of perjury.

In my view, an affiant does not commit the crime of perjury by swearing that a statement is true unless the affiant subjectively believes that the statement is in fact not true. The essential element of both of the crimes of which Furda was convicted is a false statement. In this case, the State argued to the trial court that Furda's answer to Question 8 was "the basis of the case" because the answer was "demonstrably false." The trial court agreed that "Mr. Furda knew darn well that he had been involuntarily committed to Potomac

---

**28.** According to the State, it had provided appellant with copies of the records. In any event, during the hearing on Furda's Motion for New Trial, the court reviewed the medical records that Furda attached to his motion. Evidently, it was not persuaded that the records would have changed the outcome had they been introduced during the trial.

Ridge. He was not free to leave during that time period. He knew it. It's a fact." As the majority opinion points out, however, both the State and the trial judge were incorrect in their assertions that Furda had been committed to a mental institution.

Yet, despite the fact that Furda was correct in asserting that he had never been committed to a mental institution, the majority opinion concludes that his correct assertion was nevertheless an act of perjury. According to the circuit court and the majority opinion in this case, the answer to Question 8 that would have avoided a finding of guilt on the charge of perjury was "yes" even if Furda believed that it would have been a false statement for him to swear that he "ha[d] been committed to a mental institution." I would hold that it was reversible error for the trial court to find, based upon the evidence in this case, that Furda "willfully and falsely ma[d]e an oath or affirmation as to a material fact . . . in an affidavit." For the same reason, I would also reverse the conviction for making a false statement of fact in a firearm application.

If Question 8 had asked whether any court had ever ruled that the applicant had been committed to a mental institution, then I would agree that, under the circumstances of this case, Furda's answer of "No" to that question would have supported the convictions. But Question 8 did not ask about any prior court interpretations or rulings. It asked instead: "Have you ever been . . . committed to a mental institution?" If Furda believed that the correct answer to that question was "no," then he should not be found guilty of perjury for having provided what he believed was the correct answer to that question, notwithstanding the fact that a judge had expressed a contrary opinion.

The point is illustrated by a hypothetical case in which a person is convicted of a robbery that the person knows he did not commit. If asked to answer under oath if he had ever been convicted of a robbery, the correct answer would be "yes," even if the conviction was being appealed. But, if asked to answer under oath whether he had in fact committed the

robbery, the truthful answer that would not be perjurious would be "no," regardless of the fact that some court had found otherwise.

Remarkably, the majority opinion asserts: "In the context of this case appellant's personal belief was not controlling." It seems to me that, in the context of a criminal prosecution on the charge of willfully making a false representation, the defendant's personal belief would indeed be a controlling factor.

I cannot agree with the assertion made in the majority opinion that, "[u]nder the circumstances attendant here, appellant was obligated to answer 'Yes' to Question 8 until such time as the court's finding of commitment was set aside." To me, that position is tantamount to saying that a person must commit perjury to avoid committing perjury. In my view, it distorts the obligation of the oath if we say that a witness is required to put aside personal beliefs and testify, under threat of criminal penalty, to a version of facts that is at odds with the witness's own subjective view.

Although the majority opinion devotes many pages to cases that discuss the need for obedience to court orders, cases involving contempt proceedings and injunctions have little to do with the specific question before the Court in this case, namely, whether Furda committed the crimes of perjury and false statement. Regardless of whether Furda displayed appropriate deference to the Circuit Court for Montgomery County, or whether he is a person who should have possession of firearms, in this case, Furda was neither cited for contempt nor charged with illegal possession of a firearm. The sole specific allegation of criminality in this case is that Furda illegally gave a false answer on a form when he answered, correctly, that he had never been committed to a mental institution.

The perversity of the result in this case is compounded by the fact that our Court now agrees that Furda was correct when he swore that he had never been "committed to a mental institution." It cannot be said that the representation he

made on the form—"No," I have not "been committed to a mental institution"—was a false statement of fact. His answer was literally true, and that is normally a complete defense to a charge of perjury. In view of our conclusion that the circuit court erred in making its November 7, 2007, ruling that Furda *had* been "involuntarily committed to a mental institution," I do not see how these convictions can stand. If, as we hold in the companion case, the correct answer to Question 8 truly was the one given by Furda—namely, that he was never "committed"—he should not be found guilty of perjury and false statement for having provided a correct answer to that question.

I therefore dissent from Section II of the Court's opinion.